[No. C045276. Third Dist. Sept. 12, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL C. URZICEANU, Defendant and Appellant.

## COUNSEL

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Carlos A. Martinez and Catherine G. Tennant, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROBIE, J.**—Defendant Michael C. Urziceanu claims he created a legal cooperative, FloraCare, to grow and supply medical marijuana for himself as a patient qualified to use it under the Compassionate Use Act of 1996[1] and for other patients and primary caregivers who also qualify under the Compassionate Use Act. The People assert defendant and his codefendant, Susan B. Rodger,[2] were illegally cultivating and selling marijuana.

After trial, the jury acquitted defendant of cultivating marijuana, sale of marijuana, and being a felon in possession of ammunition. The jury, however, found him guilty of conspiracy to sell marijuana and being a felon in possession of a firearm and ammunition.

Defendant argues the recently enacted Medical Marijuana Program Act[3] supplies him with a defense. As to his conviction for conspiracy, defendant argues the court should have instructed the jury on the defenses of mistake of law and the vagueness of the Compassionate Use Act. He further contends the trial court erred in its ruling on his motion to suppress evidence obtained in violation of the knock-notice law.

As we shall demonstrate, the Compassionate Use Act, alone, does not authorize collective growing and distribution of marijuana by a group of qualified patients and caregivers. However, defendant's mistake of law as to

---

[1] Health and Safety Code section 11362.5. All further statutory references are to the Health and Safety Code unless otherwise indicated.

[2] Rodger is not a party to this appeal.

[3] Section 11362.7 et seq. (Effective Jan. 1, 2004.)

whether that law provided him with a defense constitutes a defense to the charge of conspiracy to sell marijuana. The Medical Marijuana Program Act also provides defendant with a potential defense. Further, we conclude the trial court's order on the search and seizure motion must be remanded for appropriate findings by the trial court. Thus, we shall reverse defendant's conspiracy conviction and remand for a new trial on that count.[4]

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *The Prosecution's Case*

In August 2000, the police learned that marijuana was being distributed from defendant's home in Citrus Heights. From newspaper articles and the Internet, Detective Steven Weinstock discovered defendant claimed to be engaged in medical marijuana activity. Police set up surveillance on the home and questioned people who came from that home. All but one of the subjects questioned had a medical marijuana recommendation—but that one person had a cooperative card from the Oakland Cannabis Buyers' Cooperative.

In January 2001, Detective Weinstock sent Detective Sue McCurry into defendant's residence without a medical certificate in an attempt to buy marijuana. She was unsuccessful.

After defendant was shot in 2001 during an apparent drug ripoff, Detective Weinstock visited him in the hospital. During their conversation, defendant told Detective Weinstock that he planned to establish a medical marijuana cooperative like the ones operating in the San Francisco Bay Area.

On August 9, 2001, Sacramento County Sheriff's Sergeant Karlene Doupe drove to defendant's Citrus Heights home. She had a laminated medical certificate for marijuana and a Department of Motor Vehicles driver's license in her undercover name.

Sergeant Doupe knocked on the door and Rodger opened it. Sergeant Doupe asked to speak with defendant and explained that she wanted to purchase some marijuana for her headaches. While she was in the house, Sergeant Doupe saw defendant in the kitchen and noticed about 15 to 20 marijuana plants in the backyard.

---

[4] Given our disposition, we do not decide whether defendant should be required to register as a narcotics offender under section 11590 if he is again convicted of conspiracy to sell marijuana.

Rodger explained they normally only saw new members on Tuesdays or Wednesdays, but because it was slow, she could fill out the application paperwork. When Sergeant Doupe said she did not have her medical certificate, Rodger told her she could fill out the paperwork and bring her certificate in the next day. Rodger, however, would not provide Doupe with marijuana without a certificate. Sergeant Doupe went out to her car and brought in her certificate.

Sergeant Doupe filled out a FloraCare member agreement/consent form, a medical cannabis farm consent form, an affidavit of truth, and a memorandum of understanding. The member agreement stated that she had been diagnosed with a serious illness for which cannabis provides relief and had received a recommendation or approval from a physician to use cannabis. The document stated, "I understand that my contributions to F.C.H.H. through products I may acquire from the organization, are used to insure continued operation of F.C.H.H. and that this transaction, in no way, constitutes commercial promotion." The agreement further stated that the membership fee for FloraCare was $25 per year and that she agreed she would pay for the costs of goods provided and services rendered.

The medical cannabis farm consent form signed by Sergeant Doupe designated FloraCare as her "primary caregiver of health care services for the provision of medical cannabis as per the compassionate Use Act of 1996." Further, by signing the form, Sergeant Doupe confirmed under penalty of perjury that she had a qualifying medical condition and a doctor's prescription and agreed to reimburse FloraCare for the costs of gardening to cultivate her medical cannabis. The consent form further stated all of the marijuana cultivated and transported was the collective property of the person signing the document.

The other two application documents echoed these statements in various ways. In the affidavit of truth, Sergeant Doupe declared under penalty of perjury that a medical doctor recommended or approved her use of cannabis. The form also stated that she "appoint[s] F.C.H.H. and their representatives, as my true and lawful agents . . . for the limited purpose of assisting me in cultivation and thereby possession, distribution, and transportation of cannabis for my medical use. As such, I also authorize F.C.H.H. to allow other bona fide patients and caregivers who have entered into a similar agreement to jointly possess the cannabis that is cultivated under this agreement."

After Sergeant Doupe filled out the paperwork, she returned it to Rodger. She also presented Rodger with her driver's license and the medical certificate. Rodger made a copy of the certificate and explained that the documents would be entered into a computer and then removed from the site so that law enforcement would be unable to obtain them.

Rodger made five unsuccessful attempts to verify the medical certificate by calling the doctor listed by Doupe on the application. Rodger told Sergeant Doupe if the original had a gold seal, she would not have to verify its authenticity.

Rodger left the room and returned with a brown bottle she described as tincture of marijuana (alcohol in which marijuana leaves had been soaked). She offered to place a few drops of the tincture under Sergeant Doupe's tongue to help her headache, but the sergeant demurred by feigning an allergy to alcohol. Rodger put the drops of the tincture on some bread and gave the bread and a cookie that contained marijuana to Sergeant Doupe. Rodger claimed the cookies and bread were normally $2 each, but because they needed to be eaten, she would give them to Sergeant Doupe for free. Rodger also told Doupe that defendant owned the home, but that he was donating it to the business. They were going to remodel the home so there would be a room for members to relax in and a waiting/reception room.

Rodger then went into the kitchen and brought back a coffee can filled with small bags of marijuana. Rodger told Sergeant Doupe to take what she needed and that the bags were $50 each. Rodger also told Sergeant Doupe that the marijuana in the can had been donated by members of FloraCare, but there were 100 plants growing in the backyard.

Doupe took three bags and gave Rodger $160. Each bag contained 3.5 grams of marijuana and had a sticker with the word "FloraCare" on it. The sticker also bore the words: "The cannabis contained herein is intended for approved medical uses only pursuant to Health and Safety Code sections 11362.5 and 11357–11358 in accordance with the laws of the state of California." Rodger gave Sergeant Doupe three more slices of bread and $5 back as change.

Despite the forms she filled out during this transaction, Sergeant Doupe testified she never designated Rodger or defendant as her primary caregiver. Further, she testified neither Rodger nor defendant provided for her housing, health, or shelter.

On September 18, 2001, Detective Dan Donelli served a search warrant on defendant's home. During that search, officers found a greenhouse structure in the backyard that contained at least 51 plastic drinking cups, each with a marijuana plant two to four feet tall. Around the pool and backyard, police found several different marijuana gardens that contained 159 plants which weighed a total of 410.65 pounds.

Inside the house, in the garage and in a separate drying room, officers found more marijuana, drying marijuana buds, plastic cups with potting soil

in them, fertilizer, growing medium, and "grow lights." They also found glass marijuana pipes, a triple beam scale, a receipt book, marijuana leaves, various items of food made from marijuana, three guns, and assorted ammunition.[5] Officers also discovered over $2,800 in cash and what they concluded were pay/owe sheets in the home. Defendant began to smoke marijuana during the search.

After the search, officers arrested defendant and Rodger. They found $1,100 in her coat pocket. It was Detective Weinstock's opinion that defendant's marijuana operation was a front for drug dealing and that they were making money by selling marijuana.

The officers also searched Rodger's residence in Pilot Hill on the same day. There, the officers found marijuana throughout the house: a pile of marijuana clippings that weighed 120 grams, another pile of marijuana that weighed 2 1/2 pounds, several bags of marijuana that weighed between 4 grams and 1.997 pounds, and a cookie sheet with 208.6 grams of marijuana on it. A food processor in the house had obviously been used to grind marijuana, and there was marijuana butter in the refrigerator. The officers also found $6,915 in cash, a small scale, books about growing marijuana, and several pipes for smoking marijuana. Outside the house, the officers found 15 small marijuana plants, and a marijuana garden with 22 plants. The computer seized from the home contained files for 42 FloraCare identification cards, business cards, and labels for various baked goods that would likely contain marijuana.

Three months later, on January 3, 2002, officers conducted a probation search at defendant's Citrus Heights home. This time, the front room of the house looked more like a reception office, with a desk with a computer on it, rows of chairs, a coffee table with marijuana periodicals, and FloraCare business cards on top of it. This was a significantly different set up from the September 2001 configuration. During this search, officers found a little more than three ounces of marijuana, business cards for FloraCare, labels for baked goods containing marijuana, some ammunition, and a large number of plastic baggies, some with FloraCare stickers on them.

Defendant was charged with cultivation of marijuana, two counts of possession of marijuana for purposes of sale, distribution of marijuana, two counts of conspiracy to sell marijuana, and three counts of being a felon in possession of either a firearm or ammunition.

---

[5] Defendant stipulated he had a felony conviction for receiving stolen property. (Pen. Code, § 496, subd. (a).)

## B

### *Defendant's and Rodger's Background and Condition*

Defendant is 38 years old and the founder of FloraCare. His former mother-in-law owned the Citrus Heights house that housed FloraCare.

Defendant worked for the New Jersey Department of Corrections for five years. He suffered three fractured vertebrae while he worked for corrections and suffers pain from that injury. In the early part of 1990, defendant was hit by a drunk driver while on his motorcycle. In that accident, he broke his knee, chipped his heel, and dislocated his shoulder. Defendant worked as a bouncer, bartender, and manager for various clubs and was injured in a number of fights. At the times FloraCare was in existence, defendant testified he worked at the Body Shop as a bouncer, bartender, and manager.

Defendant suffers from rheumatoid arthritis in his knee, migraine headaches, bursitis, and degenerative disks. Over the years, defendant has obtained recommendations from several physicians to use marijuana to treat the pain from these conditions.

Rodger is 48 years old. She has been in two automobile accidents and suffers from back problems, severe menstrual pain, and endometriosis. She has a written recommendation from Dr. Philip Denny to use marijuana to treat these conditions. She became a member of FloraCare in March 2001 and intended FloraCare to be her caregiver.

Dr. Denny confirmed his diagnoses of defendant and Rodger and that he issued recommendations for them to use marijuana.

## C

### *The Establishment and Operation of FloraCare*

Defendant was arrested for growing marijuana in July 2000. He started FloraCare a month later. He wanted to provide a place like the cannabis clubs in the Bay Area which provide medicinal marijuana in a safe environment and at affordable prices.

Defendant claimed that each of the members of FloraCare were caregivers for each of the other members of the cooperative. Defendant claimed FloraCare and its members were caring for the health and safety of the

members of FloraCare. When he founded FloraCare, defendant spoke with law enforcement officials, members of district attorneys' offices, and attorneys.

Defendant downloaded the membership application documents used by FloraCare from the Internet. He also consulted with other cooperatives to obtain further information about those forms. Each member was required to fill out those forms as a condition of membership. Defendant testified that he used these forms so that he could follow the law. Further, each member was required to produce a valid California driver's license or type of identification and his or her original physician's recommendation. FloraCare also followed up each application with a telephone call to the physician to verify the information unless the member had a card from another club.

Rodger and defendant testified that the plants were being collectively grown for the members of FloraCare. Defendant stated that some of the plants were owned by individual members of FloraCare. Defendant and Rodger also claimed that there were actually over 300 plants at the home on September 18 rather than the 159 the officers claimed. Defendant testified that FloraCare had problems providing marijuana to its members. Thus, defendant would sometimes buy marijuana on the black market by the pound to supply the members.

Rodger claimed that sometimes marijuana was given away for free. She also admitted, however, that she typed up a list for some marijuana products with suggested donation values.

Before and after work, Rodger volunteered her time at FloraCare providing computer services, making baked goods, answering phones, helping people fill out applications, and doing whatever needed to be done. She also attempted to create a computer system for tracking the members of FloraCare.

There were a few hundred members of FloraCare. At least a dozen of the members assisted with pruning and growing the marijuana. Often defendant or one of the members would deliver marijuana to patients. Upwards of 15 members assisted FloraCare in processing new members. Members who assisted with the intake of new members were often reimbursed for intake work, in the form of gas money or marijuana, for example.

Rodger also testified she donated significant money to FloraCare. She donated $4,200 for a printer and software. She donated money to other members of FloraCare. She also paid $5,000 for a retainer at a law firm. She further lent money to FloraCare interest free. Rodger did not receive any money from FloraCare.

Rodger also testified that the money found at the property on the day the search warrant was executed was for "bonafied reimbursement" for time and materials at FloraCare.

Rodger did not usually perform the intake procedures. On the day Detective Doupe came in, she went over the application paperwork in detail with the detective and obtained her medical certificate and photo identification. Rodger told Detective Doupe that she would have to donate money to FloraCare to reimburse them for the expenses of growing the marijuana. FloraCare did waive the application fee for her.

## D

### Expert Testimony Offered by Defendant

Chris Conrad testified as an expert on the cultivation of marijuana and consumption rates for medicinal patients. He testified the 159 plants seized at defendant's residence would yield 10.2 to 11.1 pounds of bud marijuana based on an estimate that the officers seized about 191 pounds of marijuana plants. It was his opinion that this was sufficient marijuana for a half-dozen users for a year. If the amount was actually closer to 400 pounds (as the officers testified), Conrad claimed the marijuana would yield between 11 and 32 pounds of marijuana bud and would be sufficient for 12 to 20 chronic users for a year.

Conrad also testified that many California counties have guidelines that allow each qualified patient to possess and cultivate between 6 and 144 plants under the Compassionate Use Act. Sacramento County has no such guideline, while the city's guideline is 72 plants. Conrad believed the amount of marijuana FloraCare possessed fell within the guidelines of at least some of those counties. The jury was instructed this testimony was only admissible so that they could assess the basis for Conrad's ultimate opinions about crop yield and number of users who could benefit from the crop at defendant's home.

Conrad also testified that generally when patients go to the cannabis clubs existing in other counties, they pay $45 per eighth of an ounce of marijuana. The street value of medical marijuana is between $35 to $65 per eighth of an ounce.

## E

### Testimony of FloraCare Patients

Defendant and Rodger offered the testimony of a number of the people who used the services of FloraCare. Those people testified that they had

qualifying medical conditions, had physician prescriptions for the use of marijuana, and used FloraCare to obtain marijuana for personal medical uses. The patients testified that they were required to provide proof of their identification and their certificate authorizing their marijuana use and fill out paperwork before FloraCare would provide them with marijuana.

Some of the defense witnesses testified they believed they were members of a cooperative. Some testified they believed they owned a number of the plants being grown by FloraCare.[6]

Several patients testified they made donations to FloraCare to receive medical marijuana. Others testified FloraCare provided them with free marijuana and free marijuana plants. On the other hand, one witness testified that he paid $50 for an eighth of an ounce of marijuana at FloraCare and he stopped going there because he thought it was too expensive. Some patients testified that FloraCare provided them with a safe place to obtain marijuana.

The patients testified they volunteered at FloraCare. Others donated money, food, and clothes. One member donated horse manure for fertilizer and a security camera.

Joel Peterson testified that while he worked at FloraCare as a volunteer, the organization could take in $3,000 to $4,000 a day. Other days, FloraCare took in nothing. Peterson testified the money that came in went to buy fertilizer and supplies for FloraCare.

F

*Verdict and Sentencing*

The jury found defendant guilty of conspiracy to sell marijuana and being a felon in possession of a firearm and ammunition. The jury acquitted defendant of cultivating marijuana, sale of marijuana, and being a felon in possession of ammunition. The jury hung on one count of possession of marijuana with the intent to sell, and one count of conspiracy to sell marijuana.

The trial court sentenced defendant to the middle term of three years in state prison for his conviction on the charge of conspiracy to sell marijuana. The court also sentenced defendant to concurrent terms of two years for each

---

[6] At least one patient testified he was not a member of FloraCare, but rather was a member of the Oakland Cannabis Buyers' Cooperative. Additionally, some members obtained marijuana at both the Oakland club and FloraCare during the same time periods.

of his firearm/ammunition convictions and imposed a two-year term for the firearm enhancement but stayed it. Defendant appeals.

## DISCUSSION

## I

### *The Compassionate Use Act*

### A

### *Defendant Has No Right to Provide Medical Marijuana Through a Cooperative*

Defendant argues the trial court erred in refusing to allow him to present the defense that the Compassionate Use Act allowed him to form FloraCare to collectively cultivate and possess marijuana for qualified patients and primary caregivers. In this regard, defendant contends nothing in the statute prohibits qualified patients and their caregivers from joining together to pool efforts to collectively cultivate and/or obtain medical marijuana for their own personal medical uses. We disagree.

Section 11362.5 was approved by the voters in 1996. (Prop. 215, § 1, as approved by voters, Gen. Elec. (Nov. 5, 1996).) It provides:

"(a) This section shall be known and may be cited as the Compassionate Use Act of 1996.

"(b)(1) The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows:

"(A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

"(B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction.

"(C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana.

"(2) Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes.

"(c) Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes.

"(d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician.

"(e) For the purposes of this section, 'primary caregiver' means the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person."

■ In construing statutes, we start with the language of the statute. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 301 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) " 'Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.' [Citation.]" (*Ibid.*)

■ The language of the Compassionate Use Act states that under certain circumstances, two sections of the Health and Safety Code shall not apply to "a patient" or "a patient's primary caregiver" who possesses or cultivates marijuana for the "personal" medical use of "the patient." (§ 11362.5, subd. (d).) The use of the singular identifying the patient and primary caregiver as the person privileged to engage in the identified conduct and the term "personal medical purposes" suggests the Compassionate Use Act was designed for a single patient to grow or possess his or her own marijuana, or to have that marijuana possessed or grown for him or her by his or her caregiver. While a primary caregiver could care for and cultivate more than one patient's marijuana, this language lends no support to defendant's contention that "patients" and their "caregivers" can collectively pool talents, efforts, and money to create a stockpile of marijuana that is to be collectively distributed.

The statute's statement of purposes includes encouraging "the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C).) The plan contemplated by this provision is inconsistent with defendant's argument the Compassionate Use Act envisioned the interim proliferation of private enterprises and collectives to provide medical marijuana to patients. To the extent the authors of the initiative wished to include these types of organizations in its ambit, they could have expressly authorized their existence in the statute.

■ Case law further supports this view of the Compassionate Use Act. (See *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1165–1169 [128 Cal.Rptr.2d 844] (*Galambos*); *People v. Young* (2001) 92 Cal.App.4th 229, 235–238 [111 Cal.Rptr.2d 726] (*Young*); *People v. Rigo* (1999) 69 Cal.App.4th 409, 412–416 [81 Cal.Rptr.2d 624] (*Rigo*); *People ex rel. Lungren v. Peron* (1997) 59 Cal.App.4th 1383, 1389–1400 [70 Cal.Rptr.2d 20] (*Peron*); *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1543–1551 [66 Cal.Rptr.2d 559] (*Trippet*).) These cases demonstrate the Compassionate Use Act does not allow for collective cultivation and distribution of marijuana by someone who is a qualified patient for the benefit of other qualified patients or primary caregivers.

In *Trippet,* after officers found two pounds of marijuana in his car, the defendant was convicted of transportation of marijuana (§ 11360, subd. (a)) and possession of more than 28.5 grams of marijuana (§ 11357, subd. (c)). (*Trippet, supra,* 56 Cal.App.4th at p. 1536.) In determining whether the Compassionate Use Act applied to the defendant's conduct, the appellate court examined the ballot materials supporting approval of section 11362.5. (*Trippet*, at pp. 1545–1546.) Those materials stated the purpose of the statute was to provide medical marijuana for sick patients. (*Ibid.*) Importantly, however, those same ballot materials also evidenced an intention to otherwise uphold the laws prohibiting the cultivation, distribution, and use of marijuana. (*Ibid.*) Based on these ballot materials, the court had "no hesitation in declining appellant's rather candid invitation to interpret the statute as a sort of 'open sesame' regarding the possession, transportation and sale of marijuana in this state." (*Id.* at p. 1546.)

The appellate court further concluded the defendant was entitled to a new trial. (*Trippet, supra,* 56 Cal.App.4th at pp. 1548–1549.) On the charge of possession, the court held the trier of fact should determine whether the quantity possessed by a qualified patient or his or her primary caregiver, and the form and manner in which it was possessed, was "reasonably related to the patient's current medical needs." (*Id.* at p. 1549.)

█ Despite the court's acknowledgement that section 11362.5 specified only two out of the five penal laws governing marijuana, and that it could not graft exceptions onto the section not included in its express terms, the court held practical realities dictated that an implied defense might exist to a charge of transportation of marijuana. (*Trippet, supra,* 56 Cal.App.4th at pp. 1550–1551.) The court explained that the electorate could not have intended to criminalize the conduct of a primary caregiver who transports legally cultivated marijuana down the hall to a qualified patient. (*Id.* at p. 1550.) Thus, the *Trippet* court held the test for whether section 11362.5 provides an implied defense to transportation of marijuana is "whether the quantity transported and the method, timing and distance of the transportation are reasonably related to the patient's current medical needs." (*Trippet,* at pp. 1550–1551.)

█ The next case on this subject is *Peron.* There, the People had obtained a preliminary injunction against the Cannabis Buyers' Club in San Francisco barring it from using its premises for the purposes of storing, selling, or giving away marijuana. (*Peron, supra,* 59 Cal.App.4th at pp. 1386–1387.) The Cannabis Buyers' Club argued they were primary caregivers under the Compassionate Use Act and therefore the injunction must be dissolved to allow them to provide marijuana to those patients who qualified under the Compassionate Use Act. (*Peron,* at p. 1387.) The court rejected the argument that the Compassionate Use Act provided a defense to the Cannabis Buyers' Club for the sale or giving away of marijuana to qualified patients under section 11360, subdivision (a). (*Peron,* at pp. 1389, 1390–1393.) The court also concluded that only a patient or a patient's primary caregiver may possess or cultivate marijuana and that a commercial enterprise which engages in selling marijuana does not qualify under this definition. (*Id.* at pp. 1389–1390.)

In coming to these conclusions, the *Peron* court first examined whether the nonprofit sale of marijuana violated the state's marijuana laws and concluded that it did. (*Peron, supra,* 59 Cal.App.4th at p. 1390.) The law does not distinguish between selling and giving away marijuana and expressly prohibits both activities. (*Id.* at p. 1392.) Moreover, while the Compassionate Use Act specifically decriminalizes cultivation and possession of marijuana for the personal medical purposes of the patient, it is conspicuously silent on the subject of sale. (59 Cal.App.4th at p. 1392.)

The *Peron* court further concluded that the sale of marijuana and the possession of marijuana for sale remained criminal after the passage of the Compassionate Use Act. (*Peron, supra,* 59 Cal.App.4th at p. 1393.) Any other conclusion would "initiate a decriminalization of sales of and traffic in marijuana in this state. Whether that concept has merit is not a decision for

the judiciary. It is one the Legislature or the people by initiative are free to make. Proposition 215, in enacting section 11362.5, did not do so." (*Peron*, at pp. 1394–1395.)

The *Peron* court also examined the ballot materials supporting the Compassionate Use Act initiative. (*Peron, supra*, 59 Cal.App.4th at pp. 1394–1395.) The Court singled out the provisions of those materials which stated that even after the initiative was passed, it would not change other laws proscribing marijuana cultivation, use, or distribution. (*Id.* at pp. 1393–1394.) The court specifically focused on the provisions of those ballot materials that argued to the electorate that despite the passage of the Compassionate Use Act, the police could still arrest those who grow too much or try to sell marijuana. (59 Cal.App.4th at pp. 1393–1394.) The court concluded the intent of the Compassionate Use Act was to allow persons to cultivate and possess a sufficient amount of marijuana for their own personal approved medical uses (i.e., a relatively small amount) and to grant primary caregivers the same authority for those patients too ill or bedridden to do so. (59 Cal.App.4th at p. 1394.) If the electorate wished to legalize the sale of small amounts of marijuana by cooperatives or other means, it could have easily included a provision to that effect in the Compassionate Use Act, and it did not. (59 Cal.App.4th at p. 1394.)

Finally, drawing on the Compassionate Use Act's definition of a "primary caregiver" as someone who "has consistently assumed responsibility for the housing, health, or safety of that person," the *Peron* court further rejected the contention that the Cannabis Buyers' Club was the primary caregiver of the thousands of people to whom it furnished marijuana. (*Peron, supra,* 59 Cal.App.4th at pp. 1396–1397.) The court was not willing to sanction the patient's mere designation of a caregiver before receiving marijuana because that subterfuge was designed to subvert the expressed intent of the Compassionate Use Act of continuing the proscription on the sale of marijuana and possession of marijuana for sale. (59 Cal.App.4th at p. 1397.) Under the club's argument, a patient could designate any of a number of corner drug dealers as his or her primary caregiver in seriatim fashion. (*Ibid.*) In the context of the Cannabis Buyers' Club, the consistency requirement for a legitimate primary caregiver was nonexistent. (*Id.* at pp. 1397–1398.) Thus, the court concluded the club was simply a commercial enterprise open to the public for the impermissible purpose of selling marijuana.[7] (59 Cal.App.4th at p. 1397.)

---

[7] In conclusion, the court held that a primary caregiver could care for more than a single patient if the caregiver consistently provided for the housing, health, or safety of the designated patients and could also be an entity as opposed to an individual. (*Peron, supra,* 59 Cal.App.4th at pp. 1398–1399.) Moreover, in the proper circumstances, a qualified patient could reimburse his or her primary caregiver for his or her actual expenses incurred in cultivating and furnishing marijuana for the patient's medical treatment. (*Id.* at p. 1399.)

■ In *Rigo*, the defendant obtained a physician's approval for his use of marijuana after his arrest. (*Rigo, supra,* 69 Cal.App.4th at pp. 410–411.) The court rejected the defendant's attempt through his postarrest conduct to bring his prior cultivation within the scope of the Compassionate Use Act. (69 Cal.App.4th at p. 412.) As pertinent here, the court echoed *Peron*'s holding that despite the enactment of the Compassionate Use Act, "[t]he acts of selling, giving away, transporting, and growing large quantities of marijuana remain criminal." (*Rigo*, at p. 415.)

In *Young,* the defendant was convicted of transportation of marijuana when he was stopped in his car with about 4.5 ounces of marijuana. (*Young, supra,* 92 Cal.App.4th at pp. 231–232.) While we declined to address the question of whether the *Trippet* court's example of incidental transportation might be legal under the Compassionate Use Act, we also declined the defendant's invitation to extend the Compassionate Use Act as a defense to the charge of transportation of marijuana. (*Young*, at p. 237.) We found support for our holding in the statute's exemption of a patient or caregiver from only two of the marijuana laws and the analysis and legislative history outlined in *Trippet* and *Peron*. (*Young*, at pp. 235–237.)

■ Finally, in *Galambos,* the defendant argued that his cultivation of marijuana and possession of that marijuana for sale fell within the Compassionate Use Act because he was cultivating the plants for his own authorized personal use and for sale to a cannabis buyers' cooperative. (*Galambos, supra,* 104 Cal.App.4th at p. 1152.) We concluded that the limited defense provided by the Compassionate Use Act does not extend to those who supply marijuana to qualified patients or their primary caregivers. (*Galambos*, at p. 1152.) As we wrote, the Compassionate Use Act "proponents' ballot arguments reveal a delicate tightrope walk designed to induce voter approval, which we would upset were we to stretch the proposition's limited immunity to cover that which its language does not." (*Galambos*, at p. 1152.) Drawing on *Peron, Young, Rigo,* and *Trippet*, we again rejected the defendant's claim to extend the protection of the Compassionate Use Act to criminal violations not specified. (*Galambos*, at pp. 1166–1167.) We concluded the "intent of the voters [was] not to legalize any activity beyond the possession and cultivation of marijuana for personal medical use." (*Galambos*, at p. 1167.) ■ Further, we noted that the Compassionate Use Act "was narrowly drafted to make it acceptable to the voters and to avoid undue conflict with federal law. As a court, we must respect the compromises and choices made in the legislative and initiative process, not substitute our judgment of what would constitute a more effective measure." (*Galambos*, at p. 1168.)

■ These cases teach us that the Compassionate Use Act is a narrowly drafted statute designed to allow a qualified patient and his or her primary

caregiver to possess and cultivate marijuana for the patient's personal use despite the penal laws that outlaw these two acts for all others. Further, the enactment of the Compassionate Use Act did not alter the other statutory prohibitions related to marijuana, including those that bar the transportation, possession for sale, and sale of marijuana. When the people of this state passed this act, they declined to decriminalize marijuana on a wholesale basis. As a result, the courts have consistently resisted attempts by advocates of medical marijuana to broaden the scope of these limited specific exceptions. We have repeatedly directed the proponents of this approach back to the Legislature and the citizenry to address their perceived shortcomings with this law.

We conclude the trial court did not err in concluding defendant could not raise the Compassionate Use Act defense to the conspiracy charge by arguing that he lawfully and cooperatively used, cultivated, and assisted others in obtaining medicinal marijuana. Defendant was not attempting to justify his actions of conspiring to possess marijuana for sale, or selling it, by proving that he was a patient and all of the marijuana was for him. Neither did he attempt to prove that he was the primary caregiver for all of the patients who patronized his cooperative, FloraCare. Defendant did not present evidence that he consistently provided for the housing, health, or safety of the other members of FloraCare beyond their designation of him as a primary caregiver in the documents submitted to him.

Instead, defendant attempted to argue that the people who collectively made up FloraCare constituted the primary caregiver for the patients and caregivers who purchased marijuana for personal medical needs. Defendant's argument misses the mark. As the above cases demonstrate, the Compassionate Use Act was drawn narrowly to apply to a patient and his or her primary caregiver. It affords a limited defense to the patient and the primary caregiver to grow and utilize marijuana under certain specified conditions. A cooperative where two people grow, stockpile, and distribute marijuana to hundreds of qualified patients or their primary caregivers, while receiving reimbursement for these expenses, does not fall within the scope of the language of the Compassionate Use Act or the cases that construe it.

B

*The Compassionate Use Act Did Not Create a Constitutional Right to Medical Marijuana*

Defendant further contends, "Given that the State of California has granted to its citizenry the right to use marijuana as medicine, upon the recommendation of a physician, qualifying patients have a constitutional right to avail themselves of that treatment." He is wrong.

■ The nature of the right to use marijuana created by the Compassionate Use Act was examined in *People v. Mower* (2002) 28 Cal.4th 457 [122 Cal.Rptr.2d 326, 49 P.3d 1067]. There, our Supreme Court rejected the defendant's arguments that the Compassionate Use Act provided him with an absolute defense to arrest and prosecution for cultivation and possession of marijuana. (*Mower, supra,* at pp. 468–469.) Instead, the court concluded that section 11362.5 provided a defendant with a limited defense from prosecution for cultivation and possession of marijuana. (*Mower,* at p. 470.) Thus, the Compassionate Use Act created a limited defense to crimes, not a constitutional right to obtain marijuana. "The Legislature (and the people through the initiative process) hold plenary power to define crimes and establish penalties therefor. [Citations.] The initiative and section 11362.5 provide a defense for patients and primary caregivers only, to prosecution for only two criminal offenses: section 11357 (possession) and section 11358 (cultivation). Moreover, this defense is limited to the narrow circumstances approved by the voters in enacting section 11362.5, and does not allow the importation or cultivation of marijuana by large commercial enterprises, such as the Cannabis Buyer's Club." (*Peron, supra,* 59 Cal.App.4th at p. 1400.)

Defendant has no more constitutional right to cultivate, stockpile, and distribute marijuana under the Compassionate Use Act than he has to create a dispensary to collectively purchase, stockpile, and distribute any other legitimate prescription medication.

C

*Mistake of Law and Vagueness of the Compassionate Use*
*Act As to the Conspiracy Charges*

Defendant argues he "was denied his constitutional right to present a mistake of law defense to the conspiracy charge" and "the court erred by denying [his] request to have the jury instructed concerning his claim that the governing law was too vague to give adequate notice." On the first point, defendant asserts his good faith mistaken belief that his formation of FloraCare was legal, constituted a defense to the conspiracy charge because it negated his specific intent to violate the law. On the second point, defendant contends the jury was required to determine whether the vagueness of the Compassionate Use Act negated this intent as well.

1. *Mistake of Law*

During the trial, defendant presented a jury instruction on mistake of fact. Defendant's proposed instruction read, "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any

criminal intent is not a crime. [¶] Thus, a person is not guilty of a crime if he or she commits an act or omits to act under an actual belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful."

The trial court rejected this instruction, concluding, "I am going to refuse to give proposed instruction number 2. As I indicated off the record, this is not a case where mistake of fact has been raised by the evidence. What has been raised by the evidence is a mistake of law, and that doesn't constitute a defense, so I am going to refuse to give proposed instruction number 2."

During trial, the trial court repeatedly rebuffed defendant's attempts to argue and present evidence that he believed the formation and operation of FloraCare was legal. For instance, when defendant mentioned that counties other than Sacramento had established standards for what a cooperative is, the court sustained the People's objection that the law did not recognize a cooperative. When defendant began to argue "[m]edical cannabis organizations shall lead to cooperative affiliation," the court sustained the People's objection. During trial, the court sustained objections to Rodger's testimony that the members of FloraCare were sharing and growing the marijuana collectively for medical purposes. The court also excluded evidence of how other cooperatives operated in other communities to demonstrate that defendant believed his conduct was legal. When the defense argued in favor of presenting evidence of his consultations with attorneys to ensure he stayed within the law, the court responded, " 'The defense[] [that an] action [was] taken in good faith in reliance upon the advice of a reputable attorney that it was lawful, has long been rejected' " and that defendant would have to provide the court with additional authority before this testimony would be admitted.

In reaching its conclusions, the trial court was half right and half wrong. The court correctly concluded defendant's evidence did not establish a mistake of fact, but established a mistake of law. The trial court was wrong in concluding this did not present a cognizable defense. Defendant's good faith mistake of law, while not a defense to the crime of selling marijuana, was a defense to the conspiracy to commit that crime.

" '[A] trial court's duty to instruct, sua sponte, or on its own initiative, on particular defenses . . . aris[es] "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." [Citations.]' [Citation.]" (*Young, supra,* 92 Cal.App.4th at p. 233.) Here, we conclude the defense of mistake of law was an available defense supported by substantial evidence and not inconsistent with defendant's theory of the case.

■ *Young* is especially helpful in understanding the distinction between a mistake of law and a mistake of fact. (*Young, supra,* 92 Cal.App.4th at pp. 233–237.) There, the defendant argued he believed the marijuana he was carrying was medicine under the Compassionate Use Act and his belief constituted a mistake of fact that provided him with a defense to the charge of transportation of marijuana. (92 Cal.App.4th at p. 233.) We held defendant's belief that he was acting legally under the Compassionate Use Act was a mistake of law, not a mistake of fact, and thus not a defense to the crime of transportation of marijuana. (92 Cal.App.4th at pp. 235, 237.) " ' "It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof. Of course it is based on a fiction, because no man can know all the law, but it is a maxim which the law itself does not permit anyone to gainsay. It is expected that the jury and the court, where it is shown that in fact the defendant was ignorant of the law, and innocent of any intention to violate the same, will give the defendant the benefit of the fact, and impose only a light penalty . . . . The rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement." ' [Citation.]" (*Id.* at p. 234.)

Here, defendant's mistake that his formation and operation of FloraCare complied with the Compassionate Use Act was a mistake of law. Had he been convicted of selling marijuana, this mistake of law would provide no defense. Here, however, defendant was convicted of conspiracy to sell marijuana. To commit the crime of conspiracy, defendant must have had the specific intent to violate the marijuana laws (i.e., he must have known what he was doing was illegal and he must have intended to violate the law) before he can properly be convicted of conspiracy to violate those laws. Because conspiracy requires a specific intent, a good faith mistake of law would provide defendant with a defense.

■ The elements of the crime of conspiracy are generally described as follows: "A criminal conspiracy exists where it is established that there was an unlawful agreement to commit a crime between two or more people, and an overt act in furtherance of the agreement. (See [Pen. Code,] § 182, subd. (a)(1).)" (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399 [71 Cal.Rptr.2d 487].) Other cases frame the elements as follows: "Pursuant to [Penal Code] section 182, subdivision (a)(1), a conspiracy consists of two or more persons conspiring to commit any crime. A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416 [84 Cal.Rptr.2d 665, 975 P.2d 1071], fn. omitted.)

The *Morante* court further disclosed, "Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy. [Citations.] . . . 'Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the object of the conspiracy. [Citation.] "As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime," and "thus reaches further back into preparatory conduct than attempt . . ." [Citation.] [¶] . . . In some instances, the object of the conspiracy "is defined in terms of proscribed conduct." [Citation.] In other instances, it "is defined in terms of . . . a proscribed result under specified attendant circumstances." [Citation.]' " (*People v. Morante, supra,* 20 Cal.4th at pp. 416–417, fn. omitted.)

These cases, however, fail to address the impact a good faith mistake of law has on the specific intent required to commit the crime of conspiracy. "It has been recognized in California since the turn of the century that ignorance or mistake of law can negate the existence of a specific intent . . . ." (*People v. Vineberg* (1981) 125 Cal.App.3d 127, 137 [177 Cal.Rptr. 819].)

In *People v. Bowman* (1958) 156 Cal.App.2d 784, 794 [320 P.2d 70], the defendants argued the trial court erred in excluding evidence demonstrating they acted in good faith and by prohibiting the defendants from arguing that good faith to the jury in defense to conspiracy charges against them. The appellate court agreed this was error. (*Id.* at p. 799.) "Specific intent in a charge of conspiracy means that the conspirators must have the intent through concert of action to do an unlawful act, or to do a lawful act by unlawful means. The essence of the offense lies in the intent; an intent to commit a specific unlawful act or to commit a specific lawful act by unlawful means. 'Whenever a specific intent is an element of an offense the existence of the intent must be proved as a fact, and is not presumed from the commission of an unlawful act.' [Citations.] [¶] The decisions teem in verbalisms that in conspiracy the intent must be 'evil,' 'wicked,' or 'corrupt'; that the 'motives' of the participants must be 'evil' or 'corrupt.' Some say that the 'good faith' of the parties is a factor establishing a defense; others, that acting with 'just cause' is a defense. *What these terms mean is that the accused must have had a specific intent to do an unlawful act or to do a lawful act by unlawful means. This, in one case, may involve proving that he had the intent to commit murder; in another, that he had the intent to steal; in another, that he had the intent to violate a statute.* If, in a charge of conspiracy, the act involves a violation of positive law, the People must show the accused intended to violate it, or entered into the common purpose with knowledge that a violation of law would result from the commission of the contemplated act. Proof of the mere commission of the act is not enough— there must be proof of a specific intent to violate the law, and the accused

may prove he had no such intention." (*Id.* at p. 797, italics added.) Thus the *Bowman* court held that, in order to prove the crime of conspiracy to commit grand theft, unlawfully prescribing, administering, or furnishing narcotics, and practicing medicine without a license, the People were required to prove that the defendants had the specific intent to violate the statutes identified in the complaint and that the defendants had the right to show they had no such intent. (*Id.* at p. 799.) ■ " 'The phrase "good faith" in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation.' [Citation.]" (*Id.* at pp. 794–795.) The court concluded the trial court erred in excluding evidence offered by defendants demonstrating their good faith and in refusing to permit the defendants' counsel to argue the question to the jury. (*Id.* at pp. 794, 799.)

■ In *People v. Marsh* (1962) 58 Cal.2d 732, 742–743 [6 Cal.Rptr. 300, 376 P.2d 300], our Supreme Court concluded the trial court erred in instructing the jury that it could convict the defendants of conspiracy to practice medicine without a license by showing the defendants intended to commit acts that themselves violated the law. (*Id.* at pp. 742–743.) The court explained, "The essence of the crime of conspiracy is the 'evil' or 'corrupt' agreement to do an unlawful act. It is the evil intent that makes a combination criminally indictable. 'The association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act?' [Citation.]" (*Id.* at p. 743.) The court continued, "For these reasons it is often said that conspiracy is a 'specific intent' crime [citations]. This specific intent of the conspirators must be proved in each case by the prosecution and will not be presumed from the mere commission of an unlawful act (*People v. Bowman*, [*supra,*] 156 Cal.App.2d 784, 797 [320 P.2d 70]; [citation]). Therefore, even though a conspiracy has as its object the commission of an offense which can be committed without any specific intent, there is no criminal conspiracy absent a specific intent to violate the law. That is, to uphold a conviction for conspiracy to commit a 'public welfare offense' there must be a showing that the accused knew of the law and intended to violate it."[8] (*Marsh*, at p. 743.)

---

[8] While the sale of marijuana is not a "public welfare offense" (see *People v. Coria* (1999) 21 Cal.4th 868, 876–880 [89 Cal.Rptr.2d 650, 985 P.2d 970] [manufacturing of a controlled substance does not fit this definition]), the cases demonstrate this specific intent is required for all conspiracies. *Marsh* relied on *Bowman* for this proposition and *Bowman* dealt with conspiracy to commit grand theft, unlawfully prescribing, administering, or furnishing narcotics, and practicing medicine without a license. (*People v. Bowman, supra,* 156 Cal.App.2d at p. 787.)

Thus, in defense to the charge of conspiracy, "the defendants are entitled to offer evidence of their good faith or mistake." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 76, p. 288.) Further, this "requirement of specific intent applies to all conspiracies," even conspiracies to commit those crimes that require no specific intent. (*Id.* at p. 289.)

The defendant may not prove a good faith mistake of law by arguing he was unaware of the precise statute he was violating. In *People v. Smith* (1966) 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222], the Supreme Court held it was irrelevant whether a defendant knew the crime he was about to commit was burglary as defined under California law when he entered a store in an attempt to cash a forged check. In that case, the defendant's specific *criminal* intent was demonstrated by his judicial admission that he entered the store with the intent to cash checks he knew were forged and he knew that was unlawful. (*Id.* at pp. 792–793.) Thus, whether he knew he had violated a particular statute did not demonstrate the type of mistake that would disprove his criminal intent and therefore was not relevant. (*Ibid.*) The court explained, "the law recognizes honest purpose, not dishonest ignorance of the law, as a defense to a charge of committing a crime requiring 'specific intent.' " (*Id.* at p. 793.)

As these cases demonstrate, defendant's good faith belief he was not violating the law is relevant in the context of the charge of conspiracy to sell marijuana. If the jury believed that defendant had a good faith belief, based on the Compassionate Use Act, that his actions were legal, this would negate the specific intent to violate the law required for a conspiracy conviction. That, ultimately, is a question of fact for a properly instructed jury.

Defendant presented evidence that he contacted law enforcement officers and public officials to ensure that his operation met the requirements of the Compassionate Use Act and attempted to cooperate with the police and authorities in an effort to bring his organization in line with the Compassionate Use Act. As noted above, however, the trial court repeatedly sustained objections to the admission of evidence on this subject, refused defendant the ability to argue this point to the jury, and specifically and erroneously concluded that defendant's mistake of law was not a defense.

The People argue defendant was able to place some evidence on this point before the jury and the court instructed the jury on the Compassionate Use Act. Whether defendant actually fit the parameters of the Compassionate Use Act misses the point of defendant's claim here. The real question is whether he had a good faith belief that FloraCare fit within those parameters. Further, the prosecutor undercut this argument when she argued to the jury, "The law does not recognize cooperatives, cannabis buyers' club, whatnot. It does not

recognize the sales, the furnishing, the giving away, the possession for sales. 11362.5 is only a defense if you meet all the burdens, all of the elements that I have already shown you on the screen for possession and cultivation."

The trial court's consistent rejection of this argument, its exclusion of evidence supporting this defense, and its prohibitions on defendant's arguments were error.

### 2. Vagueness

In conjunction with his mistake of law defense, defendant also presented the trial court with a jury instruction that stated: "Due Process requires that a person be given fair notice as to what constitutes illegal conduct so that he may conform his conduct to the requirements of the law. If you find that the relevant law, as it existed at the time the offense was committed, is highly debatable, the defendant—actually or imputably—lacks the requisite intent to violate it, and you must find him not guilty." Initially, the court concluded that this issue could be appropriately raised and presented to the jury. Later, the court concluded this was an issue for the court, rather than the jury, and refused to give defendant's proposed instruction.

Generally, the question of whether a statute provides sufficient notice to a defendant that he or she is violating the law is a question of law for the trial court. (See *People v. Gregory* (1990) 217 Cal.App.3d 665, 675 [266 Cal.Rptr. 527].) It is the role of the trial judge to specify the law, and the role of the jury to determine the questions of facts in light of the law provided to them by the judge. (Pen. Code, § 1126; CALJIC No. 1.00.)

Defendant points to *People v. Gregory, supra,* 217 Cal.App.3d 665. In that case, the defendant was convicted of presenting false information to Medi-Cal with the specific intent to defraud in violation of Welfare and Institutions Code section 14107. (*Gregory*, at p. 674.) The defendant argued the regulations under which he submitted his Medi-Cal claims were void for vagueness because they failed to apprise him that his method for determining the proper payment request was wrong. (*Id.* at p. 672.) The appellate court concluded the question of whether the Medi-Cal regulations were overly vague was "properly at issue *as a question of fact* probative on the question of defendant's intent." (*Id.* at p. 679.) The court observed that the defendant's knowledge of those regulations was relevant in three ways. (*Id.* at pp. 676–677.) First, the statute applied to a claimant who knowingly submitted false information. (*Id.* at p. 676.) To find that the defendant knowingly submitted false information, the jury had to necessarily find that he knew the definition of the procedure for which he was seeking reimbursement and that his conduct did not fall within that definition. (*Id.* at p. 676.) Second, the

statute required that the defendant submitted the false information for the purpose of obtaining more money than he was entitled to and to show this, the jury had to find that he knew of his legal entitlement. (*Ibid.*) Third, the court concluded that the defendant's knowledge was relevant to the statutory requirement that he had the "intent to defraud." (*Ibid.*)

Applying *Gregory* to the crime of conspiracy, defendant argues that the crime of conspiracy required him to have the specific intent to violate the law and therefore the jury should have determined whether the Compassionate Use Act was so vague that he was unable to form that intent. The question for the jury to decide, however, is not whether the jury thinks the Compassionate Use Act is too vague to be enforceable against this defendant; the relevant question is what this defendant thought the laws relating to the medical use of marijuana required or allowed. And the jury must decide this question in the context of defendant's claim that he did not have the specific intent to violate the law and was, for that reason, not guilty of participating in a criminal conspiracy.

That is, on retrial, defendant will be allowed to present any relevant evidence that goes to the issue of his intent to break the law. He can testify he thought that what he was doing was legal in part because he read the Compassionate Use Act and he thought it allowed him to do what he did. And he can tell the jury why his reading of the law led him to that conclusion. But this is all a part of and falls within the framework of his claim he did not harbor the necessary specific intent to violate the law. His reading of the statute is merely another factor supportive of his claim he acted with a good faith belief that he legally could do what he did. The jury's own view of the vagueness or specificity of the Compassionate Use Act has nothing to do with this question. They must view this act through defendant's eyes and ascertain its effect on his state of mind.

In closing, we note that the jury's charge is not to determine whether this law is too vague to be enforced against defendant. Rather, the jury must determine whether this defendant lacked the specific intent required for conspiracy. On this point, defendant was entitled to present evidence that the law was vague.

### 3. *Prejudice*

Placing their emphasis on the question of whether the defendant's actions fell within the Compassionate Use Act and emphasizing that the trial court instructed the jury that conspiracy required, inter alia, the "specific intent to agree to commit the [subject] crime," the People have not attempted to rebut defendant's argument that the failure to provide these two instructions was

prejudicial. First, whether defendant's conduct actually fell within the confines of the Compassionate Use Act's safe harbor does not answer the question of whether he held a good faith belief that his conduct was legal, such that he could not be convicted of conspiracy to sell marijuana.

■ Second, we reject the *Bowman* court's conclusion that the standard jury instructions defining the specific intent for conspiracy covers the mistake of law question presented here, and that a judge may properly reject instructions proffered to properly apprise the jury of the affirmative defense to the charge of conspiracy of a defendant's mistake of law. (*People v. Bowman, supra,* 156 Cal.App.2d at p. 799.) The standard jury instruction for conspiracy states that defendant must have the "specific intent to agree to commit the crime." (CALJIC No. 6.10.) This instruction fails to apprise the jury that a defendant may not have the requisite specific intent to violate the law required for a conspiracy charge based on his good faith mistake of law. Obviously, such an instruction is not necessary where there is no reasonable basis for a defendant to conclude his or her actions in conjunction with the conspiracy were lawful (e.g., conspiracy to commit a murder). Because defendant's specific intent to violate the law is a key element of the conspiracy charge, we conclude the failure to instruct on these points is not harmless under either the standard enunciated by *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711, 87 S.Ct. 824] or under *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243].

The evidence defendant presented on this point, coupled with the evidence and his arguments in support of his belief that the trial court rejected, demonstrate his intent was a question of fact that the jury should have determined. Thus, we must reverse defendant's conviction for conspiracy to sell marijuana.

II

*Application of the Medical Marijuana Program Act*

In supplemental briefing in this court, defendant argues that the Medical Marijuana Program Act provides him with a new defense to the charge of conspiracy to possess marijuana for sale. We conclude the law should be applied retroactively and it does provide defendant with a potential defense. We shall remand for a new trial.

Under the law that preexisted the Medical Marijuana Program Act, the collective cultivation and distribution of marijuana was not provided for in the Compassionate Use Act. (See pt. IA, *ante.*) As we have noted, the Compassionate Use Act stated that one of its purposes was to encourage the

state and federal government to implement a plan to provide for the safe and affordable distribution of medical marijuana to those patients who need it. (§ 11362.5, subd. (b)(1)(C).) The Medical Marijuana Program Act is the Legislature's initial response to that directive. (Stats. 2003, ch. 875, § 1.)

In the Medical Marijuana Program Act, the Legislature sought to: "(1) Clarify the scope of the application of the [Compassionate Use Act] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. [¶] (2) Promote uniform and consistent application of the [Compassionate Use Act] among the counties within the state. [¶] (3) Enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects." (Stats. 2003, ch. 875, § 1, subd. (b).) The Medical Marijuana Program Act further evidenced "the intent of the Legislature to address additional issues that were not included within the [Compassionate Use Act], and that must be resolved in order to promote the fair and orderly implementation of the act." (Stats. 2003, ch. 875, § 1, subd. (c).)

The Medical Marijuana Program Act includes guidelines for the implementation of a state regulated program in California for issuing identification cards to qualifying patients and their primary caregivers. (§§ 11362.7–11362.81.) The Medical Marijuana Program Act defines a "qualified patient" as one who is entitled to the protections of the Compassionate Use Act, but who does not have an identification card issued pursuant to the Medical Marijuana Program Act. (§ 11362.7, subd. (f).) Further, the statute provides an expanded definition of what constitutes a primary caregiver. (§ 11362.7, subd. (d).) It starts with the definition of a "primary caregiver" contained in the Compassionate Use Act: "the individual, designated by a qualified patient . . . who has consistently assumed responsibility for the housing, health, or safety of that patient or person . . . ." (§ 11362.7, subd. (d).) The subdivision goes on to provide three examples of persons who would qualify as primary caregivers under this definition, including the owners or operators of clinics or care facilities; an individual who has been designated as a primary caregiver by more than one qualified patient, all of whom live in the same city or county as he; and an individual who has been designated by a single qualified patient who resides outside of the city or county from the individual. (*Ibid.*)

The Medical Marijuana Program Act further provides limitations on how much marijuana a patient or qualified primary caregiver may possess or cultivate for personal medical uses, and authorizes physicians to prescribe more than this amount under certain circumstances, and further authorizes cities and counties to establish guidelines that exceed these base amounts.

(§ 11362.77.) Under the Medical Marijuana Program Act, a qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient. (§ 11362.77, subd. (a).) Further, a qualified patient or primary caregiver may maintain no more than six mature or 12 immature plants per qualified patient. (*Ibid.*)

■ The Medical Marijuana Program Act further expressly expands the scope of the Compassionate Use Act beyond the qualified defense to cultivation and possession of marijuana. In section 11362.765, the law provides, "(a) Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570. However, nothing in this section shall authorize the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, nor shall anything in this section authorize any individual or group to cultivate or distribute marijuana for profit. [¶] (b) Subdivision (a) shall apply to all of the following: [¶] (1) A qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use. [¶] (2) A designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes, in amounts not exceeding those established in subdivision (a) of Section 11362.77, only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver. [¶] (3) Any individual who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person." Thus, this section extends the protections of the Compassionate Use Act to the additional crimes related to marijuana: possession for sale (§ 11359), transportation or furnishing marijuana (§ 11360), maintaining a location for unlawfully selling, giving away, or using controlled substances (§ 11366), managing a location for the storage or distribution of any controlled substance for sale (§ 11366.5), and the provisions declaring a building used for selling, storing, manufacturing, and distributing a controlled substance to be a nuisance (§ 11570).

■ Under section 11362.765, subdivision (c), "A primary caregiver who receives compensation for actual expenses, including reasonable compensation incurred for services provided to an eligible qualified patient or person with an identification card to enable that person to use marijuana under this article, or for payment for out-of-pocket expenses incurred in providing those services, or both, shall not, on the sole basis of that fact, be subject to prosecution or punishment under Section 11359 or 11360." This section thus allows a primary caregiver to receive compensation for actual expenses and

reasonable compensation for services rendered to an eligible qualified patient, i.e., conduct that would constitute sale under other circumstances.

**(28)** As relevant here, the Medical Marijuana Program Act contains section 11362.775, which states, "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." Thus, the Legislature also exempted those qualifying patients and primary caregivers who collectively or cooperatively cultivate marijuana for medical purposes from criminal sanctions for possession for sale, transportation or furnishing marijuana, maintaining a location for unlawfully selling, giving away, or using controlled substances, managing a location for the storage, distribution of any controlled substance for sale, and the laws declaring the use of property for these purposes a nuisance.

This new law represents a dramatic change in the prohibitions on the use, distribution, and cultivation of marijuana for persons who are qualified patients or primary caregivers and fits the defense defendant attempted to present at trial. Its specific itemization of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana. Contrary to the People's argument, this law did abrogate the limits expressed in the cases we discussed in part IA which took a restrictive view of the activities allowed by the Compassionate Use Act.[9]

The question then becomes whether this Medical Marijuana Program Act applies to defendant's conduct, which predates the law. We conclude it does.

In *Trippet,* the court held the Compassionate Use Act should be applied retroactively. The court agreed with the People's concession in that case that "absent contrary indicia, 'the Legislature is presumed to have extended to defendants whose appeals are pending the benefits of intervening statutory

---

[9] The People do not take issue with defendant's contention that the defense contained in section 11362.775 also extends to conspiracies to commit the crimes listed in section 11362.775. We agree with defendant's contention. Section 11362.775 states a defendant who qualifies under that section "shall not solely on the basis of that fact be subject to state criminal sanctions" under the statutes that prohibit those acts. Under Penal Code section 182, conspiracy is "punishable in the same manner and to the same extent as provided for the punishment of [the underlying] felony." Thus, punishment for conspiracy to violate crimes listed in section 11362.775 is a state sanction for violation of the underlying crimes and is barred by the defense contained in section 11362.775 for those who qualify for its protection.

amendments which decriminalize formerly illicit conduct [citation], or reduce the punishment for acts which remain unlawful. [Citations.] No different rule applies to an affirmative defense to the crime for which a defendant was convicted, which defense was enacted during the pendency of her appeal.' Proposition 215 [the Compassionate Use Act] contains no savings clause and so, as the Attorney General further concedes, 'it may operate retrospectively to defend against criminal liability, in whole or part, for some who are appealing convictions for possessing, cultivating and using marijuana.' [Citation.]" (*Trippet, supra,* 56 Cal.App.4th at pp. 1544–1545.)

■ The same reasoning applies here. In the Medical Marijuana Program Act, the Legislature expressly stated it intended to "[e]nhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects" and to "address additional issues that were not included within the act, and that must be resolved in order to promote the fair and orderly implementation of the act." (Stats. 2003, ch. 875, § 1, subds. (b)(3), (c).) Further, the Medical Marijuana Program Act sets forth the new affirmative defense allowing collective cultivation of marijuana, expands the defense to penal sections not identified by the Compassionate Use Act, and contains no savings clause. These facts lead us to the conclusion that this law must also be retroactively applied.

Here, at trial, defendant produced substantial evidence that suggests he would fall within the purview of section 11362.775. He presented the court with evidence that he was a qualified patient, that is, he had a qualifying medical condition and a recommendation or approval from a physician. His codefendant Rodger submitted that same evidence as to herself. Defendant further presented evidence of the policies and procedures FloraCare used in providing marijuana for the people who came to him, including the verification of their prescriptions and identities, the fact that these people paid membership fees and reimbursed the defendant for costs incurred in the cultivation through donations. Further, he presented evidence that members volunteered at the cooperative.

Faced with this evidence and proper jury instructions directing them to consider defendant's status as a qualified patient or primary caregiver under the Compassionate Use Act, the jury acquitted him of two marijuana charges, including charges of cultivation and sale of marijuana. Further, the jury was unable to reach a unanimous verdict on two other charges of possession for sale and conspiracy to possess marijuana for sale. On the cultivation charge, we cannot conclude, as a matter of law, that the jury believed that defendant was a qualified patient, or was acting as a primary caregiver. At the same time, however, we cannot conclude the jury would reject defendant's claim on retrial that his cooperative falls within the parameters of section 11362.775. Thus, we must remand the case for a new trial on this issue.

## III

### *The Motion to Suppress*

#### A

##### *Standard of Review*

In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's findings of fact, both express and implied, if supported by substantial evidence. However, we independently apply the pertinent legal principles to those facts to determine as a matter of law whether there has been an unreasonable search or seizure. (*People v. Miranda* (1993) 17 Cal.App.4th 917, 922 [21 Cal.Rptr.2d 785].) Here, because the trial court did not clearly articulate reasons for denying the motion, we reverse and remand for additional findings.

#### B

##### *The Search*

Defendant sought to suppress the evidence discovered in the January 3 search of his home. Specifically, he sought to exclude marijuana smoking devices and pipes, FloraCare business cards, indicia showing he lived at the home, documents related to marijuana distribution, marijuana, plastic bags, six 20-gauge Winchester shotgun shells, $1,100 in cash, officer observations following the entry, and any other evidence obtained during the search. The court conducted an evidentiary hearing.

Defendant stipulated that he was on searchable probation at the time of the officers' entry into his home. At the suppression hearing, Detective Weinstock testified that he and four other officers conducted a search of defendant's home on January 3, 2002, at approximately 4:45 p.m. The officers were wearing police raid entry gear which includes defensive equipment and a black vest emblazoned with a police emblem on the front and the word "Police" in large yellow letters on the back.

Detective Weinstock had been to defendant's residence prior to this search and estimated that it was approximately 1,200 square feet. Detective Weinstock also knew defendant had at least three prior cases involving the possession of firearms. Detective Weinstock had visited defendant in the hospital prior to

this search related to an incident where defendant had been shot.[10] Detective Weinstock further testified that defendant had never threatened him prior to this search.

When the officers approached the front door, they passed in front of a large window. Detective Weinstock testified that the window was covered and he could not see through it. When they reached the front door, Detective Weinstock knocked loudly on the front door. He also announced in a loud voice: "Probation—police department. Probation search. Demand entry." When he did not receive any response, he repeated the knocking and announcement. Again, he received no response. Detective Weinstock testified that at least 30 seconds passed between the time he first knocked and the time he made entry. The officers used a steel ram to break the front door open.

When they entered, they again announced their presence. Rodger was standing at a desk about 10 feet from the door. She was on the telephone and told the detective she was calling her attorney. Detective Weinstock told Rodger to sit down. Defendant was walking down a short hallway toward the front room. The officers told defendant to get down on the ground.

The People rested, and the defense presented the testimony of Rodger, defendant, and a neighbor, Jan Brockes.

Brockes testified she lived across the street from defendant. On the day of the search, she was out in the front of her house playing basketball with her kids in the street. She saw two uniformed officers park two doors down from defendant's home and walk up to the front of his home carrying a large object. As soon as they got to the door, they opened the screen door, hit the front door two times with the object, and entered. Brockes testified the officers did not knock before they hit the door. Brockes also testified she did not hear the officers say anything before they entered.

Rodger testified she was on the telephone seated at the desk in the front room of the house when the officers arrived. She saw them cross in front of the front window. Rodger stood up. The detectives knocked and yelled, "Police, open up." Rodger testified she said, "Hold On. [Defendant's] coming to open the door." There was a pause, and then the police knocked again and shouted "Police, open up." The next thing that happened was the door broke open and the police rushed in. Rodger estimated eight to 10 seconds passed between the time the officers first knocked and the door first opened.

Defendant testified he and Rodger were the only people in his house at the time of the search. The front door was locked. Rodger was on the telephone

---

[10] This testimony was stricken by the court based on an objection by the People.

and defendant was working on the computer. Rodger was about five or six feet from the front door. There was nothing blocking the front window to his home. Defendant saw the officers approaching his home and he was getting up to open the door for them. Defendant testified that Detective Weinstock "quickly beat on the door, [and] yelled something. As soon as he yelled, I got up. And the next thing I knew, the door came flying open." The officers entered with guns drawn, yelled for defendant to get down on the ground, and one of them threw defendant to the ground. Defendant testified a few seconds passed between the knock and the entry.

Defendant further testified he had three prior encounters with Detective Weinstock at his home prior to this search. During those encounters, defendant informed the officer he was cultivating medical marijuana.

Defendant's investigator testified that when he stood on the home's front porch, he could hear Rodger speaking in a normal volume voice from where she claimed to be sitting on the day of the entry. He also noted that damage to the front door had been repaired by a two-inch by eight-inch plate of metal.

Detective Weinstock testified in rebuttal that he was familiar with the knock-notice law. Further, he informed every member of his team that they would comply with that law prior to this search. Detective Weinstock did not hear Rodger say that defendant was coming to open the door.

He also testified there was a concern for his safety due to his knowledge that firearms had been present on the property in the past. He admitted that in prior searches of the premises, defendant had not directed any force against the officers and had informed the officers where firearms were located.

After hearing the evidence, the trial court ruled as follows: "I think the law in the state is clear that if the officers knock and announce, that they substantially complied. And on that basis, I am going to deny the [Penal Code section] 1538.5 [motion]. I do want the record to reflect that it is not because I do not believe any of the witnesses [who] testified on behalf of the defense."

## C

### *The Knock-Notice Law*

■ No law specifically governs the conduct of a search under a probation search condition. (*People v. Constancio* (1974) 42 Cal.App.3d 533, 542 [116 Cal.Rptr. 910].)

Penal Code Section 1531 governs the conduct of law enforcement officers when entering a dwelling to conduct a search pursuant to a search warrant: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance."

Probation searches are subject to the Fourth Amendment's requirement of reasonableness. (*People v. Constancio, supra,* 42 Cal.App.3d at p. 542.) Although a person subject to a probation search condition waives any expectation of privacy in his or her home, "the remaining policies and purposes underlying the statutory knock-notice provisions must be satisfied in the execution of a probation search of a residence." (*Id.* at pp. 543–544.)

"Thus, before entering a residence, police officers must (1) knock or use other means reasonably calculated to give adequate notice of their presence to the occupants, (2) identify themselves as police officers, and (3) explain the purpose of their demand for admittance. [Citations.]" (*People v. Mays* (1998) 67 Cal.App.4th 969, 973 [79 Cal.Rptr.2d 519].)

Penal Code "[s]ection 1531 permits an officer executing a search warrant to break into the premises *only if he is refused admission after announcing 'his authority and purpose.'* Even where the police duly announce their identity and purpose, forcible entry is not permitted under the statute if the occupants of the premises are not first given an opportunity to surrender the premises voluntarily." (*Jeter v. Superior Court* (1983) 138 Cal.App.3d 934, 937 [188 Cal.Rptr. 351], italics added.)

There need not be an explicit refusal of admittance before officers are entitled to enter a house to execute a search warrant. "The failure to respond within a reasonable time under the circumstances may constitute a refusal within the meaning of the statute." (*People v. Gallo* (1981) 127 Cal.App.3d 828, 838 [179 Cal.Rptr. 662].) "There is no convenient test for measuring the length of time necessary to support an implied refusal." (*People v. Neer* (1986) 177 Cal.App.3d 991, 996 [223 Cal.Rptr. 555].) The relevant question is whether there are "specific facts, such as shouting or running, to support an objectively reasonable belief the occupants had refused entry." (*Ibid.*)

"[A]n entry effected in violation of the provisions of th[e] [knock-notice] statute renders any following search and seizure unreasonable within the meaning of the Fourth Amendment." (*Garcia v. Superior Court* (1973) 29 Cal.App.3d 977, 980 [106 Cal.Rptr. 98].)

Four primary reasons underlie the knock-notice rule in California: " ' "(1) The protection of the privacy of the individual in his home [citations]; (2) the

protection of innocent persons who may also be present on the premises . . . [citation]; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice [citations]; and (4) the protection of police who might be injured by a startled and fearful householder." ' [Citation.]" (*People v. Hoag* (2000) 83 Cal.App.4th 1198, 1203 [100 Cal.Rptr.2d 556].)

## D

### *Substantial Compliance*

"Although a violation of knock-notice could render a search unreasonable within the meaning of the Fourth Amendment [citation], not every technical violation will have this effect [citation]. California appellate courts have recognized the concept of substantial compliance in appropriate circumstances. [Citation.] ' "Substantial compliance means ' "*actual* compliance in respect to the substance essential to every reasonable objective of the statute," as distinguished from "mere technical imperfections of form." ' " [Citation.] The essential inquiry is whether under the circumstances the policies underlying the knock-notice requirements were served. [Citation.]' " (*People v. Hoag*, *supra*, 83 Cal.App.4th at p. 1208.)

As we have already noted, the trial court concluded, "I think the law in the state is clear that if the officers knock and announce, that they substantially complied. And on that basis, I am going to deny the [Penal Code section] 1538.5 [motion]. I do want the record to reflect that it is not because I do not believe any of the witnesses [who] testified on behalf of the defense."

This "finding" creates more confusion than it resolves. As best we can discern, the trial court concluded that the officers did not comply with the knock-notice law, but their knocking and announcement of their presence was all that was needed to constitute substantial compliance with the knock-notice law. This would seem to explain why the trial court did not have to credit the testimony of Detective Weinstock who testified the officers waited 30 seconds or disbelieve the defense witnesses who testified either the officers immediately entered (Brockes) or waited eight to 10 seconds (Rodger). Without further explanation, for officers to simply knock and immediately enter does not constitute substantial compliance.

While our ordinary standard of review would dictate that we review this ruling deferring to the factual findings that supported the ruling, thus crediting the 30-second testimony, the court's "finding" that it "did not disbelieve" the defense witnesses points toward the failure of the police to wait at all, or that they waited a very short time.

Counsel for the People and defendant further confuse the issue by their selective choice of which time frame to argue about: The People choose the police's version; the defendant chooses the eight-to-10-second testimony.

Based on this factual uncertainty and the trial court's failure to make the simple factual findings as to what testimony it believed, we cannot uphold the trial court's conclusion of substantial compliance. Simply knocking, announcing, and bursting through a locked door with a battering ram, without more, is not substantial compliance with the knock-notice law. It fails to meet any one of the policies underlying the law. This entry fails to meet the policy of avoiding damage to the home by the breaking in of the lock on the front door. Unlike the facts of *Hoag*, where the officers entered by turning the knob of an unlocked door (*People v. Hoag, supra,* 83 Cal.App.4th at p. 1202), the police here bashed through a locked door with a battering ram. This entry further fails to meet the policy of avoiding potential harm to innocent parties or avoiding a potentially violent conflict and injury to the police by a startled homeowner faced with a swarm of police officers with drawn guns.

If defendant and Rodger are believed, rather than "not disbelieved," the eight-to-10-second time frame before bashing in the door may or may not support a finding of substantial compliance. While the police announcement of their presence and subsequent pause lessens the risk to the people present on the scene, this short time frame does not meet the policy of attempting to prevent damage to the home by allowing the homeowner a sufficient opportunity to open the door.

Finally, a trial court finding, supported by substantial evidence, that the officers waited 30 seconds before they proceeded, in light of the size of this house, may in fact, support a finding that the officers fully complied with the knock-notice law and were refused admittance.[11]

Given that the case must be remanded for retrial on other issues and that defendant has not argued the evidence seized in this search had any bearing on the counts we do not reverse, we reverse the trial court's ruling and remand for appropriate findings by the trial court.

---

[11] The People also argued exigent circumstances justify the search but there are no findings to suggest this contention.

## DISPOSITION

The conviction for conspiracy to sell marijuana (count three) is reversed. The trial court's ruling on the motion to suppress is also reversed. The convictions for a felon in possession of a firearm and ammunition (counts four and five) are affirmed. The matter is remanded for a new trial.

Morrison, Acting P. J., and Hull, J., concurred.