50 Cal.Rptr.3d 91 (2006)
143 Cal.App.4th 1461
The PEOPLE, Plaintiff and Respondent,
v.
Roger William MENTCH, Defendant and Appellant.
No. H028783.
Court of Appeal of California, Sixth District.
October 18, 2006.
*93 Joseph M. Bochner, under appointment by the Court of Appeal, in association with the Sixth District Appellate Program, for Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Moona Nandi, Supervising Deputy Attorney General, and Michele J. Swanson, Deputy Attorney General, for Respondent.
*92 ELIA, J.
Health and Safety Code section 11358 makes cultivating marijuana a crime.[1] However, at the General Election held on November 5, 1996, the electors approved Proposition 215, entitled Medical Use of Marijuana. Relevant here, the measure added section 11362.5, the Compassionate Use Act of 1996 (hereinafter the CUA). Subdivision (d) of section 11362.5 provides that section 11358 relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician. (People v. Mower (2002) 28 Cal.4th 457, 463, 122 Cal.Rptr.2d 326, 49 P.3d 1067.) In this case, among other things, we are asked to decide if appellant provided substantial evidence that he was a primary caregiver as defined by section 11362.5.
On March 11, 2005, a jury found appellant Roger William Mentch guilty of cultivation of marijuana (§ 11358, count one) and possession of marijuana for sale (§ 11359, count two).[2] Further, the jury found true an allegation that in the commission of these offenses appellant was armed with a firearm, to wit, rifles. (Pen. Code, § 12022, subd. (a)(1).)
The trial court suspended the imposition of sentence and granted appellant probation for three years.
Appellant filed a timely notice of appeal on May 3, 2005.
On appeal, appellant raises 10 separate, but related issues only two of which we need to address in this opinion. First, he contends that the trial court improperly refused to provide to the jury a defense requested "primary caregiver" instruction to the cultivation charge. Second, the possession for sale conviction must be reversed because the court below failed to instruct sua sponte regarding his right to receive compensation for actual expenses.[3]
*94 As we shall explain, we agree with appellant's first and second contentions. Our conclusion that the trial court deprived appellant of a defense requires reversal of the judgment.

Facts and Proceedings Below

Prosecution Evidence
Heidi Roth, a teller at Monterey Bay Bank, became familiar with appellant over the period of February to April 2003. Appellant came into the bank on several occasions and made large deposits of cash, each one totaling over $2,000. Roth noticed that some of the money appellant deposited smelled strongly of marijuana. The smell was so strong that it filled up the bank. The bank had to remove the money from circulation. Roth noted that the deposits consisted of mostly small bills, such as $20, $10, and $5 bills. The total amount of money that appellant deposited with the bank over a two-month period was $10,750. Consequently, on April 15, 2003, Roth filed a suspicious activity report with the Santa Cruz County Sheriffs' Office, relating the questionable nature of appellant's deposits.
Mark Yanez, a narcotics investigator with the Sheriff's Office, followed up on Roth's tip. He interviewed Roth and her supervisor, and examined the money appellant deposited with the bank. The money "reeked" of marijuana. The smell, coupled with the large amount of money deposited by appellant, suggested to Yanez that appellant was profiting from the sale of marijuana. As part of his follow-up investigation, Yanez obtained the PG & E records for appellant's residence to see how much power he was using. Upon concluding his preliminary investigation, Yanez obtained a warrant to search appellant's house for marijuana and to seize the money appellant had deposited with Monterey Bay Bank.
Only two of appellant's deposits remained in the bank's vault at the time Yanez served his warrant: one consisting of $2,000 in cash made up of one $100 bill, 90 $20 bills, and 10 $10 bills, the other consisting of $2,740 in cash made up of nine $100 bills, 78 $20 bills, 14 $10 bills, and 28 $5 bills.
On June 6, 2003, Yanez and four deputies went to appellant's house to serve the warrant. Yanez noticed that there was a car parked in the carport and a Harley-Davidson motorcycle parked on the front porch. The deputies knocked on the front door and announced their presence. When appellant opened the door, Yanez told him they had a warrant to search his house for marijuana. Appellant told Yanez that he had a medical recommendation for marijuana. Yanez handcuffed appellant and detained him outside the house while the deputies went inside to secure the residence. A search of appellant's person turned up $253 in cash and a small vial of hash oil, or concentrated cannabis. Yanez *95 advised appellant of his rights and interviewed him in a police vehicle parked outside appellant's residence.
Appellant told Yanez that he had a medical marijuana recommendation for colitis, dysphoria, and depression, and that he smoked about four marijuana cigarettes, totaling approximately one-sixteenth of an ounce, per day for medicinal purposes. When Yanez asked appellant if he sold marijuana, appellant responded that he sold to five medical marijuana users. Appellant told Yanez that he lost his job about a year and half earlier, and that he was not receiving any unemployment income. Appellant said that he paid his $1,600 rent and other bills with his savings and the money he made from selling marijuana. The deputies who went inside the residence conducted a protective sweep and discovered Laura Eldridge and her seven-year-old daughter in the living room. After searching them and finding no contraband, the deputies allowed them to leave.
A search of appellant's residence revealed a garbage can in the kitchen containing an altered PVC pipe containing marijuana leaf residue. In the living room, deputies found a functioning taser gun lying on a television stand near the front door. Also in the living room, the deputies found the following: books on growing marijuana; instructions on how to extract hash oil from marijuana plants; a picture depicting a large marijuana crop being cultivated outdoors; a photo album containing pictures of appellant and growing marijuana plants; receipts for a carbon dioxide tank; a coffee grinder containing marijuana residue; and four pairs of trimming shears with marijuana residue. Inside a closet in the living room, deputies found an unloaded .22 caliber pump-action rifle. On a shelf in the living room, they found a wooden box containing marijuana buds and smoking papers, a wooden box containing four baggies of marijuana and 10 vials of hash oil, a bowl containing hash oil, unused vials, and eyedroppers, and a 100-gram balance scale.
Yanez testified to the significance of some of the items found in the living room. He explained that carbon dioxide helps indoor marijuana plants photosynthesize and grow faster. Often, eyedroppers are used to transfer a batch of hash oil into smaller containers. Coffee grinders are used to grind up marijuana leaves and stems so that hash oil can be extracted. Typically, gram scales are used to weigh drugs in order to package them for sale. Usually, marijuana packaged for sale is divided up into similar amounts, like the baggies of marijuana discovered in appellant's living room, which contained 3.1 grams, 2.6 grams, 3.1 grams, and 3.6 grams of marijuana, respectively. Yanez told the jury that the baggies contained just under one-eighth of an ounce each, an amount normally sold on the street and worth approximately $40 to $60 each.
During their search, deputies discovered video surveillance cameras set up to record the front entrance to the house and the hallway outside one of the rooms on the first floor. The door of the room under surveillance was padlocked on the outside. Posted on the wall next to the door were several documents including a certificate in appellant's name from the Oakland Cannabis Buyers' Club, dated September 6, 2001. In addition, a physician's statement by Dr. Richard A. Hanson, dated September 6, 2001 listed appellant's conditions as colitis and depression. A medical marijuana recommendation from Dr. Thomas J. O'Connell dated July 24, 2002, listed appellant's conditions as insomnia, dysphoria, alcohol abuse, diarrhea, attention deficit disorder, and colitis. A notice from Compassionate Caregivers of Oakland, dated March 9, *96 2003, listed Michael Manstock as the grower and stated, "this is a medicinal marijuana crop."
Inside the room, deputies found 39 marijuana plants in the flowering or budding stage. Yanez explained to the jury that the flower or bud of a marijuana plant is the most desirable part of the plant because it contains THC resin, the substance that produces a "high" when smoked. The grow room also contained a video camera, a ventilation system with temperature and humidity gauges, an irrigation system, high-intensity hood lights, ballasts to support the extra electricity needed for the lights, metallic paper for reflecting the light onto the plants, and an attachment for a carbon dioxide tank. Yanez noted that a hood light costs $200 to $300 and its light bulb costs $50 to $100. A door leading from the grow room to an outdoor patio behind the house was reinforced with a metal strip and a window in the door was covered up with a board. Across the hallway from the grow room, deputies discovered a bedroom containing a bed, a dresser, and men's clothing. As well as a $617 PG & E bill in appellant's name for the residence, a marijuana bud, pictures of indoor and outdoor marijuana crops with notations regarding the types of plants and growing times, a 200-gram digital scale, a pH tester, the deputies discovered a closet with a locked safe inside. When appellant unlocked the safe for the deputies, they discovered a loaded, but locked Baretta .40 caliber semiautomatic handgun, $140 in cash, checkbooks in appellant's name from Monterey Bay Bank, Washington Mutual, and Bank of America, a bag containing 3.48 grams of psilocybin mushrooms, and certificates of title in appellant's name for a Toyota pickup truck and a 2001 Harley-Davidson motorcycle.
In another room next to the kitchen, deputies discovered 57 "clone" marijuana plants. Yanez explained to the jury that a clone plant results when a clipping taken from a female marijuana plant is placed in cloning solution and then planted in soil. This process ensures that the cloned plant will be female, which is desirable because female plants are the ones that produce the high-quality buds used for smoking. The clone room contained two ionizers, which work by taking in the surrounding air and filtering out any odors, a strainer used for making hash oil, a partially filled box of .40 caliber handgun ammunition, and an unloaded .22 caliber bolt-action rifle leaning against the wall.[4] Yanez explained that typically people would use ionizers to mask the strong odor if they do not want their neighbors to know they are growing marijuana.
Deputies discovered a closet inside the clone room with three two-by-fours tacked over the door. Inside the closet was a trapdoor leading down to a basement area. The key to the door leading to the basement area was found on appellant's person. In the basement, deputies found a second grow room containing 43 marijuana plants in the flowering or budding stage. The room contained an irrigation system, moveable hood lights on a track system, and tags on the plants listing the different strains of marijuana and the dates on which they were planted.
In a second room in the basement, deputies found 48 marijuana plants in the growing or vegetative stage. Yanez told the jury that the plants had not yet begun to bud. The plants had markers on them identifying the marijuana strain that was *97 being grown. Yanez opined that the markers are used to determine the strain that produces the most buds, so that those strains can be used during the next harvest. As different strains can produce different quantities of THC, knowledgeable growers can maximize their THC content by growing the more productive strains.
In a small closet in the basement, deputies found three "mother" plants, which Yanez opined were likely the female plants from which the clippings were taken to make the clone plants upstairs. The plants had fluorescent lights above them. Yanez told the jury that because marijuana plants die after they bud, mother plants are kept in a constantly lit room to prevent budding, so that they can continue to live and produce clippings for more clone plants.
Deputies confiscated all of the marijuana plants except for the three mother plants. Yanez ordered the deputies to leave the mother plants behind because he knew appellant had a valid medical recommendation and that he would need to grow some marijuana to meet his own personal medical needs.
Yanez described to the jury the marijuana growing cycle and explained that the entire growing process can take anywhere from two to three months from start to finish. Thus, a grower harvesting every two months will have six harvests a year, while a grower harvesting every three months will have four harvests a year. A marijuana plant is harvested when it has fully flowered. The buds are cut off, trimmed, dried out, and then packaged. Growers gather THC resin from the leaves and stalks of the plant to make hash oil. Although the buds contain a higher level of THC than the leaves and stalks, both the buds and the resin from the leaves and stalks are used to obtain a "high." The buds are smoked while the resin is orally ingested, added to a marijuana cigarette, or added to baked goods.
In order to grow marijuana indoors, Yanez explained the plants need plenty of light to mimic the light from the sun. Growers typically use hood lights, which use high-intensity light bulbs, during the vegetative and flowering stages. Lower intensity fluorescent lights are used during the start phase so as not to harm the clone plants. Timers are used to control the lighting throughout the growing cycle. During the start phase, the fluorescent lights will be on for 24 hours a day to encourage fast growth. During the vegetative stage, the hood lights will be on for 16 to 20 hours a day to simulate the summer months, during which time marijuana plants do their most extensive growing. During the flowering stage, the amount of time the hood lights are on is reduced to eight to 10 hours a day to simulate the winter months, during which time marijuana plants flower and produce buds. Yanez opined that people who grow marijuana indoors often do so to avoid detection by law enforcement or other people. In addition, although outdoor plants produce more buds, indoor plants have a higher THC content and their growing season is much shorter.
Yanez told the jury that on the street, one gram of marijuana costs $20, 3.5 grams (or one-eight of an ounce) costs $40 to $60, one-half of an ounce costs $150 to $200, one ounce costs $300 to $400, and one pound costs about $4,000. Sellers discount their prices on larger quantities to increase their sales and to save them the trouble of packaging the marijuana in smaller quantities. Yanez explained that when he investigates whether a grower is using marijuana for medicinal purposes or for other purposes, he first verifies that the person has a medical recommendation to use marijuana. Once that has been *98 confirmed, Yanez looks for any indications that the person is selling marijuana, such as the presence of scales for weighing the marijuana, packaging materials, notes related to marijuana sales, large amounts of money or other assets attained through drug sales, or large quantities of marijuana that are out of proportion to the person's medical needs. Yanez also considers the nature of a person's medical ailment in cases when there are indications the marijuana is being sold. Yanez told the jury that medical recommendations for marijuana are easy to obtain, and a recommendation for a condition that is "outside the spirit of the law" would indicate to him that the marijuana is being sold rather than being used for medicinal purposes. Yanez noted that people who sell marijuana from their residence do not typically sell to people they do not know.
In his experience, Yanez noted that people who have legitimate medical marijuana recommendations are usually forthright with authorities. They will check to make sure that the marijuana they are growing for their own personal use complies with the guidelines set by the medical marijuana law.
Considering the evidence seized from appellant's bank and residence, as well as his statement to Yanez, Yanez opined that, while appellant may have personally consumed some of the marijuana he grew, his operation was primarily a for-profit commercial venture. Yanez also opined that the guns kept around appellant's house were a part of the marijuana growing operation. Yanez explained that growers or sellers often use guns to protect their marijuana against theft. Yanez found it significant that the rifles in appellant's house were located in rooms where they could be easily retrieved if someone broke into the house. Yanez found it unremarkable that the guns were unloaded, noting that the display of a firearm is typically enough to scare off an unarmed person.
Deputy William Gazza testified as an expert on the manufacture of concentrated cannabis. Taking into account the evidence seized at appellant's house, Gazza opined that appellant was manufacturing concentrated cannabis in the powdered form of "kief" and in the liquid form of hash oil.

Defense Evidence
Leland Besson testified that he had known appellant for two years. In June 2003, Besson was on disability and had a medical marijuana recommendation for a bad back, neck, and joints. At the time, he was smoking approximately two to three grams of marijuana a day. For about one year before appellant was arrested, Besson purchased his marijuana exclusively from appellant, who knew about Besson's medical marijuana recommendation. Appellant supplied medical marijuana through his business, the Hemporium. Besson gave appellant $150 to $200 in cash every month for one and one-half ounces of marijuana, the amount Besson usually consumed in one month.
Laura Eldridge used to drive Besson over to appellant's house to get the marijuana. While there, Eldridge also obtained marijuana from appellant. Eldridge cooked and cleaned for Besson. In addition to driving him to the grocery store, Eldridge drove Besson to doctors' appointments, and to pick up his medications. The only time Besson saw appellant was when Eldridge took him to appellant's house to get marijuana.
Laura Eldridge testified that she had known appellant for about three years. At the time of trial, they were involved in a romantic relationship. In June 2003, she was working as a caretaker for Besson. At the time, she herself had a medical *99 marijuana recommendation for migraine headaches and posttraumatic stress disorder. She was smoking about five or six marijuana cigarettes a day and consuming about one ounce of marijuana a month. Eldridge obtained marijuana exclusively from appellant for about one year before his arrest. Appellant provided the marijuana through his medical marijuana business, the Hemporium. Eldridge obtained the marijuana from appellant every month, paying him $200 to $250 in cash for one ounce and $25 in cash for one-eighth of an ounce if she needed more.
Eldridge was at appellant's house getting her daughter ready for school on the morning of appellant's arrest. At the time, she and appellant were not living together but were seeing each other romantically, and Eldridge had stayed over at appellant's house the night before the search warrant was served. After deputies searched her and her daughter, they allowed her to leave to take her daughter to school. Eldridge testified that the mushrooms the deputies found in appellant's safe belonged to her son's friend. The day before appellant's arrest, the boy showed the mushrooms to Eldridge. She confiscated them, brought them over to appellant's house, and told him to put them in his safe. Eldridge did not have access to the safe. Eldridge had "no idea" why she saved the mushrooms as opposed to just flushing them down the toilet.
Appellant testified in his own defense. In March 2002, he lost his job as a Unix Systems administrator. At the time, he was making $90,000 a year. That same year, he obtained a medical marijuana recommendation and began growing marijuana. He learned how to grow marijuana from reading books, searching the Internet, and talking to people. He kept marijuana plants in all three stages of growth so that he was in a constant cycle of marijuana production, which produced a yield of four harvests a year. He opened the Hemporium, a care giving and consultancy business, in March 2003. The purpose of the Hemporium was to give people safe access to medical marijuana. Appellant's medical marijuana recommendation was still current on the day the police searched his home.[5] At that time, he smoked four to six marijuana cigarettes a day (approximately one-sixteenth of an ounce), and consumed between one-and-one-half to two ounces of marijuana a month. The hash oil found in his house was his first-ever batch and the vial found on his person was for his own personal use. At the time, he used hash oil on a regular basis.
Appellant regularly provided marijuana to five other individuals, including Besson, Eldridge, and a man named Mike Manstock. Sometimes he did not charge them. All five individuals had valid medical marijuana recommendations. Appellant did not provide marijuana to anyone who did not have a medical marijuana recommendation. Occasionally, he took any extra marijuana he had to two different cannabis clubs, The Third Floor and an "unknown-unnamed place." Although a majority of the marijuana plants in appellant's home belonged to him, some belonged to Manstock. Appellant had a notice on the door to that effect. In addition, appellant let Besson and Eldridge grow one or two plants.
Appellant provided marijuana to Besson about once every month and to Eldridge about once or twice every month. On *100 average, they each gave him $150 to $200 for an ounce and a half of marijuana a month. Appellant considered his marijuana "high-grade" and provided it to Besson and Eldridge for less than street value. He used the money they paid him to pay for "nutrients, utilities, part of the rent." Appellant did not profit from his sales of marijuana, and sometimes he did not even recover his costs for growing the marijuana. Appellant counseled his customers about the best strains of marijuana to grow for their ailments and the cleanest way to use the marijuana. He took a "couple of them" to doctors' appointments on a sporadic basis. Although he asked all five of them to come to court and testify on his behalf, only Besson and Eldridge showed up. He did not subpoena the others because one of them was out of state, another one did not want to be involved because his father was an attorney, and the other one did not want to testify. At the time of the search, appellant had checking accounts at Monterey Bay Bank, Bank of America, and Washington Mutual. In addition, he had savings in the form of cash and stocks. His only source of income in 2003 was from the Hemporium. Appellant spent $300 to $600 a month on electricity to run his marijuana growing equipment, and "several hundred dollars a month on nutrients." A one-quart bottle of growth enhancement alone cost $50.
The equipment appellant used to grow the marijuana was also expensive; each of the hood lights cost $500, the irrigation system cost "[h]undreds of dollars," the timers, chemicals, and nutrients cost $500, and the carbon dioxide tank cost $300. Appellant's other monthly expenses included $1600 in rent, $50 for gas for his vehicles, $200 for vehicle insurance, $400 for food and entertainment, and $30 credit card payments.
Appellant owned the 1992 model BMW parked in his carport on the day of the search. He purchased the car in 1997 for $17,500. In 2003, he still owed monthly payments of $107 on the car. Appellant purchased the Harley-Davidson motorcycle brand-new in 2001 for $17,000. In 2003, he still owed monthly payments of $363 on the motorcycle. In addition, he owned a 1987 Toyota pickup truck in 2003.
Appellant testified that he had four surveillance cameras set up around his house at the time of the search. One camera was located outside the front door and monitored the walkway up to the house as well as the porch where he parked his motorcycle. Appellant set up the cameras after being burglarized in order to protect his motorcycle and home from theft. A former girlfriend gave him the rifles for safekeeping back in 1994 or 1995. He used the rifles for target practice and for protection. Neither rifle was loaded. The one found in the clone room was inoperable. Appellant did not keep ammunition for either rifle in his house. He purchased the taser gun and the Baretta handgun for protection. Appellant kept the Baretta, which was in working condition, inside the safe.
Appellant confirmed that the mushrooms belonged to a friend of Eldridge's son. The day before the search, Eldridge gave them to appellant because she did not know what they were. He put them in the safe because he did not know if they were poisonous and he thought it was "a good place to ... keep kids away." Appellant did not use mushrooms, and he "should have" thrown them away. Appellant used the 200-gram electronic scale to weigh jewelry and marijuana. Since the scale was worth approximately $200, he kept it secured in his bedroom to protect it from thieves.
*101 Christopher Conrad, a cannabis expert, testified for the defense. Conrad testified that because of the difficulties in obtaining and growing marijuana, it is not unusual for a medical user of marijuana to keep a significant amount of marijuana in reserve. Medical users who grow their marijuana indoors have to keep a four-month supply on hand to get them through the next harvest. Those who grow their marijuana outdoors have to keep a whole year's supply on hand. Depending on how much a person uses, the amount of marijuana that is kept in reserve ranges from one to four pounds. It is not unusual for people who use marijuana to keep their marijuana in different bags. Users might do this to keep track of the amount of marijuana they have left or to keep track of the different kinds of marijuana they have. Conrad noted that the basement area of appellant's house was not a good place to grow marijuana, and that indications of yellowing on the plants in the basement suggested a potential problem in the growing process. He felt that the plants in the basement were "doomed," that the chance of obtaining usable marijuana from those plants was low. Not counting the plants in the basement, appellant's crop had a potential yield of three to six pounds of usable marijuana per year. If the basement plants had not been in such bad condition, the entire crop would have yielded 12 pounds of usable marijuana per year. Conrad explained that a person who smokes four to six marijuana cigarettes a day consumes approximately three pounds of marijuana a year. A person who smokes an ounce and a half a month consumes one pound, two ounces of marijuana a year. Conrad noted that the presence of the following factors would have made it more likely that appellant's marijuana garden was for commercial purposes: a ready supply of marijuana packaged for sale; pay-owe sheets, a larger number of starter plants, higher-yielding plants, fewer varieties of marijuana, and more foot traffic to and from appellant's house. The presence of scales in appellant's house did not contribute to Conrad's opinion "one way or the other" because scales are sometimes used for legitimate purposes by medical marijuana patients.
After the court instructed the jury and submitted the case to them, they propounded several questions. First, the jury asked whether "the certificates, displayed at Hemp Emporium LLC, allow[ed] Mr. Mentch to sell or distribute marijuana to other card holding patients under the terms of the law?" The court answered, "no, it's not lawful to distribute or sell to other card holders, given the evidence in this case, and I think, if you'll check the instructions, it's consistent with the instructions." Later, the jury asked to see the "Law on Proposition 215." The court told the jury that they had all the law they needed in the jury instructions. Thereafter, the jury propounded two more questions: "Was Robert [sic] Mentch within his right to manufacture hash oil? Was the amount in his possession a reasonable amount under the Compassionate Use Act ...?" The court responded, "It's the instruction that I gave you on the Compassionate Use Act, medical marijuana defense. You know which one it is.... [¶] The question about was this a reasonable amount, those types of things, those are questions for you to answer."
After more deliberations, the jury asked if appellant could "recover his cost from the manufacture of marijuana from patients using the medicine under [Proposition] 215?" The court reiterated that the answer was "the same one I gave before .... Based upon the evidence in this case, he is not authorized by the law to sell or distribute marijuana." The jury's fifth and final question concerned whether the *102 taser related to the gun enhancement allegations. The court informed the jury that the firearm allegations related only to the two rifles. Shortly thereafter, the jury returned its verdicts.

Discussion
In his first assignment of error appellant contends that the "trial court improperly refused to provide a requested `primary caregiver' instruction to the charge of cultivation" of marijuana.
In full, CALJIC No. 12.24.1 provides: "The [possession] [or] [cultivation] [or] [transportation] of marijuana is not unlawful when the acts of [defendant] [a primary caregiver] are authorized by law for compassionate use. The [possession] [or] [cultivation] [or] [transportation] of marijuana is lawful (1) where its medical use is deemed appropriate and has been recommended or approved, orally or in writing, by a physician; (2) the physician has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief; [and] (3) the marijuana [possessed] [cultivated] [transported] was for the personal medical use of [the patient] [______] [; and (4) the quantity of marijuana [[possessed] [or] [cultivated], and the form in which it was possessed were reasonably related to the [patient's] [______] then current medical needs, not exceeding [ (limits) ] [eight ounces of dried marijuana per qualified patient] [six mature or twelve immature marijuana plants per qualified patient] unless the [qualified patient] [or] [[primary caregiver] has a doctor's recommendation that this quantity does not meet the qualified patient's medical needs, in which case the [qualified patient] [or] [[primary caregiver] may possess an amount of marijuana consistent with the patient's needs.] [transported, and the method, timing and distance of the transportation were reasonably related to the [patient's] [______] then current medical needs.] [¶] Only the dried mature processed flowers of the female cannabis plant or the plant conversation shall be considered when determining allowable quantities of marijuana [under this section]. [¶] [The term `qualified patient' means a person who is entitled to the protections of the compassionate use law [, but who does not have an identification card issued by the state].] [¶] [A `primary caregiver' is an individual designated by [the person exempted] [ (name) ] who has consistently assumed responsibility for the housing, health, or safety of that person.] [¶] [`Recommendation' and `approval' have different meanings. To `recommend' something is to present it as worthy of acceptance or trial. To `approve' something is to express a favorable opinion of it. The word `recommendation,' as used in this instruction, suggests the physician has raised the issue of marijuana use and presented it to the patient as a treatment that would benefit the patient's health by providing relief from an illness. The word `approval,' on the other, suggests the patient has raised the issue of marijuana use, and the physician has expressed a favorable opinion of marijuana use as a treatment for the patient.] [¶] To establish the defense of compassionate use, the burden is upon the defendant to raise a reasonable doubt as to guilt of the unlawful [possession] [or] [cultivation] [or] [transportation] of marijuana."[6]
*103 Before trial, the prosecutor filed a motion in limine to exclude any references by counsel during voir dire, testimony, or closing that appellant was a caregiver to Ms. Eldridge or Mr. Besson. The prosecutor asserted that they could testify to any care that appellant provided to them, but argued that the determination of whether appellant was a caregiver rested with the jury. The court granted the prosecutor's motion.
After Ms. Eldridge and Mr. Besson testified, the court said that the evidence was insufficient to show that appellant provided "the defined caregiver services." Defense counsel submitted to the court a brief in which she argued that a person may qualify as a patient's primary caregiver when they consistently assume responsibility for a patient's health by providing medicinal marijuana upon a doctor's recommendation or approval, and may be reimbursed for their services in so doing.
The court held that absent anything more, by just providing medical marijuana appellant was not a caregiver. Defense counsel objected that refusing the caregiver instruction effectively denied appellant the right to put on a defense and hence a fair trial.
Subsequently, appellant took the stand. As noted, he testified that he regularly provided marijuana to five individuals, including Besson, Eldridge, and Mike Manstock. Furthermore, he counseled them about the best strains of marijuana to grow for their ailments and the cleanest way to use the marijuana. Moreover, he took a "couple of them" to doctors' appointments on a sporadic basis.
During discussion between counsel and the court on the instructions to be given to the jury, the court explained that consistent with prior rulings the jury would be instructed with CALJIC No. 12.24.1, but any references to care giving would be deleted from the instructions.
Appellant argues that the court below "introduced a new, non-statutory `bright line' rule under which no patient who requires medical marijuana can ever lawfully obtain the drug from another person unless, and only if, the patient also has other, non-medical marijuana health, safety or housing needs that the medical marijuana caregiver provides."
The compassionate use defense has its origins in Proposition 215. As noted, Proposition 215 added section 11362.5 to the Health and Safety Code. That section provides: "(a) This section shall be known and may be cited as the Compassionate Use Act of 1996.[¶] (b)(1) The [P]eople of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows: [¶] (A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief. [¶] (B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction. [¶] (C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana. [¶] (2) Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical *104 purposes. [¶] (c) Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes. [¶] (d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."
The CUA defines a primary caregiver as "the individual designated by the person exempted under [section 11362.5] who has consistently assumed responsibility for the housing, health or safety of that person." (§ 11362.5, subd. (e).)
"It is well settled that a defendant has a right to have the trial court, [even] on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence (People v. Michaels (2002) 28 Cal.4th 486, 529 [122 Cal.Rptr.2d 285, 49 P.3d 1032])  evidence sufficient for a reasonable jury to find in favor of the defendant (Mathews v. United States (1988) 485 U.S. 58, 63 [108 S.Ct. 883, 99 L.Ed.2d 54])  unless the defense is inconsistent with the defendant's theory of the case (People v. Breverman (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094]). In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether `there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' [Citations.]" (People v. Salas (2006) 37 Cal.4th 967, 982-983, 38 Cal.Rptr.3d 624, 127 P.3d 40.) Thus, whether the trial court erred in failing to instruct the jury that a defendant is not guilty of the crime of cultivating marijuana (§ 11358) if he is a primary caregiver, turns on whether the defendant offered substantial evidence that, if believed, by the jury, would raise a reasonable doubt as to the unlawfulness of the cultivation.
Appellant argues that his uncontradicted testimony established that he provided counseling services to his patients and occasionally had assisted them to their medical appointments. In addition to medical marijuana, he furnished valuable advice regarding what types of marijuana and methods of administration were best. This constitutes evidence of care giving under section 11362.5 because he aided the health of these five patients, and he had accepted responsibility, at least with respect to the above services.
Relying on People v. Mower, supra, 28 Cal.4th 457, 122 Cal.Rptr.2d 326, 49 P.3d 1067 (Mower) and People ex rel. Lungren v. Peron (1997) 59 Cal.App.4th 1383, 70 Cal.Rptr.2d 20 (Peron), and People v. Urziceanu (2005) 132 Cal.App.4th 747, 33 Cal. Rptr.3d 859, (Urziceanu), respondent argues there is "no case law to support appellant's nonsensical reading of section 11362.5's definition of primary caregiver."
In Mower, detectives interviewed the defendant while he was in the hospital because of complications arising from his diabetes. The defendant told the detectives that he grew marijuana for himself and for two other patients, who also had prescriptions. (People v. Mower, supra, 28 Cal.4th at pp. 465-466, 122 Cal.Rptr.2d 326, 49 P.3d 1067.) Later, at trial, the defendant testified that he kept the 31 plants for himself. The defendant denied the truth of his hospital statement, claiming that he made the statement under the influence of various medications with which he was being treated. (Id. at p. 466, 122 Cal.Rptr.2d 326, 49 P.3d 1067.) *105 After the presentation of the evidence, the trial court instructed the jury on the crimes of possession and cultivation of marijuana and gave an instruction based on the compassionate use defense based on the defendant's claim that he was a qualified patient, but without any reference to a qualified primary caregiver. (Ibid.)
On appeal, Mower argued that section 11362.5, subdivision (d), granted him complete immunity from prosecution, shielding him not only from prosecution, but even from arrest. (Mower, supra, 28 Cal.4th at p. 466, 122 Cal.Rptr.2d 326, 49 P.3d 1067.) The Court of Appeal affirmed the judgment and the Supreme Court granted review to address the question of whether section 11362.5 grants a defendant complete immunity from prosecution. (Id. at pp. 466-467, 122 Cal.Rptr.2d 326, 49 P.3d 1067.)
After holding that section 11362.5, subdivision (d), grants a defendant a limited immunity from prosecution by allowing a defendant to set aside an information or indictment prior to trial, the Supreme Court recognized that section 11362.5 allows a medical defense at trial. (Mower, supra, 28 Cal.4th at p. 474, 122 Cal. Rptr.2d 326, 49 P.3d 1067.) The Supreme Court then addressed Mower's argument that the Court of Appeal erred by rejecting his claim that the trial court improperly failed to instruct the jury on a section 11362.5, subdivision (d), defense based on a theory that he was a qualified caregiver. (Id. at p. 475, 122 Cal.Rptr.2d 326, 49 P.3d 1067.)
The Supreme Court concluded that such an instruction would not have been supported by substantial evidence noting that for a person to be a qualified primary caregiver, he or she must be "`designated'" as such by a qualified patient, and must have "`consistently assumed responsibility' for the qualified patient's `housing, health or safety.'" (Mower, supra, 28 Cal.4th at p. 475, 122 Cal.Rptr.2d 326, 49 P.3d 1067.) The Supreme Court concluded that since the "sole evidence relevant to this issue was the statement made by defendant at the hospital, the truth of which he denied at trial, that he kept the 31 marijuana plants not only for himself but also for two other unnamed persons" there was no evidence that the defendant had been designated by either one as a primary caregiver, or that he consistently had assumed responsibility for either person's housing, health or safety. (Ibid.)
In Peron, Division Five of the First District Court of Appeal addressed the issue of the effect of section 11362.5 on section 11570, which requires that the owners and operators of any "drug house" be enjoined from continuing to operate such a drug sales facility. (Peron, supra, 59 Cal. App.4th at p. 1389, 70 Cal.Rptr.2d 20.)
After the passage of Proposition 215, the defendants in Peron, the operators of a Cannabis Buyers' Club, moved to modify a preliminary injunction that the trial court had granted, prior to the passage of that initiative, enjoining the defendants from using the club for the purpose of selling, storing, keeping or giving away marijuana. (Peron, supra, 59 Cal.App.4th at pp. 1385-1387, 70 Cal.Rptr.2d 20.) The defendants moved the trial court to modify the injunction on the ground that they were primary caregivers as defined by the newly enacted section 11362.5. (Id. at p. 1387, 70 Cal. Rptr.2d 20.) The trial court issued an order modifying the injunction, which stated that the defendants "`shall not be in violation of the injunction issued by this Court if their conduct is in compliance with the requirements of [section] 11362.5. [Defendants] may possess and cultivate medicinal marijuana for their personal medicinal use on the recommendation of a *106 physician or for the personal medicinal use of persons who have designated [defendants] as their primary caregiver pursuant to [section] 11362.5(e) whose physician has recommended or approved the use of medicinal marijuana either orally or in writing to the [defendants].'" (Id. at pp. 1387-1388, 70 Cal.Rptr.2d 20.)
Among other things, the Peron court concluded that section 11362.5 only exempts a patient or the patient's primary caregiver from prosecution under section 11358 (marijuana cultivation) when either the patient or the primary caregiver cultivates marijuana only for the patient's personal medical purpose upon the written or oral recommendation or approval of a physician. (Peron, supra, 59 Cal.App.4th at pp. 1389-1390, 70 Cal.Rptr.2d 20.) Since the defendants operated a commercial establishment selling marijuana to qualified public purchasers, they did not qualify as primary caregivers even though they obtained from each purchaser a designation as such prior to and as a condition of a marijuana sale to that person. (Id. at p. 1390, 70 Cal.Rptr.2d 20.) Specifically, the Peron court concluded that "[o]ne maintaining a source of marijuana supply, from which all members of the public qualified as permitted medicinal medical users may or may not discretionally elect to make purchases, does not thereby become the party `who has consistently assumed responsibility for the housing, health or safety' of that purchaser as section 11362.5 ... requires." (Ibid.)
In Urziceanu, supra, 132 Cal.App.4th 747, 33 Cal.Rptr.3d 859, the defendant claimed that he created a legal cooperative, FloraCare, to grow and supply medical marijuana for himself as a patient qualified to use it under the CUA and for other patients and primary caregivers who also qualified under the CUA. (Id. at p. 758, 33 Cal.Rptr.3d 859.) A jury found the defendant guilty of conspiracy to sell marijuana and being a felon in possession of a firearm and ammunition. On appeal to the Third District Court of Appeal, the defendant argued that the trial court erred in refusing to allow him to present a defense that the CUA allowed him to form FloraCare to collectively cultivate and possess marijuana for qualified patients and primary caregivers. The defendant contended that nothing in the CUA prohibited qualified patients and their caregivers from joining together to pool efforts to collectively cultivate and/or obtain medical marijuana for their own personal medical uses. (Id. at p. 767, 33 Cal.Rptr.3d 859.)
In disagreeing with the defendant, the Urziceanu court noted that the CUA "is a narrowly drafted statute designed to allow a qualified patient and his or her primary caregiver to possess and cultivate marijuana for the patient's personal use despite the penal laws that outlaw these two acts for all others." (Urziceanu, supra 132 Cal.App.4th at pp. 772-773, 33 Cal.Rptr.3d 859.) However, the Urziceanu court concluded that the defendant could not raise a compassionate use defense to a conspiracy charge by arguing that he lawfully and cooperatively used, cultivated, and assisted others in obtaining medical marijuana. Specifically, the court noted that the defendant "was not attempting to justify his actions of conspiring to possess marijuana for sale, or selling it, by proving that he was a patient and all the marijuana was for him. Neither did he attempt to prove that he was the primary caregiver for all of the patients who patronized his cooperative, FloraCare. Defendant did not present evidence that he consistently provided for the housing, health or safety of the other members of FloraCare beyond their designation of him as a primary caregiver in the *107 documents submitted to him."[7] (Id. at p. 773, 33 Cal.Rptr.3d 859.)
We find each of these cases upon which respondent relies to be distinguishable from this case. In Mower, the defendant did not even claim he was a primary caregiver at trial. Rather, his defense was that all the plants were for his personal use. (Mower, supra, 28 Cal.4th at p. 475, 122 Cal.Rptr.2d 326, 49 P.3d 1067.) Furthermore, he did not attempt to present any evidence that the two patients designated him as their primary caregiver, or that he had consistently assumed responsibility for each person's housing, health or safety. (Ibid.)
In Peron, the defendants did not present any evidence that they had consistently assumed responsibility for their buyers' housing, health or safety beyond the fact that they maintained a medical marijuana supply from which qualified buyers could purchase, and their patrons designated them as primary caregivers. (Peron, supra, 59 Cal.App.4th at p. 1390, 1395, 70 Cal.Rptr.2d 20.)
Finally, in Urziceanu, the defendant did not present any evidence at trial that he was a primary caregiver for the patrons of FloraCare beyond the designation as such in the documents that his purchasers submitted to him. (Urziceanu, supra, 132 Cal.App.4th at p. 773, 33 Cal.Rptr.3d 859.)
In this case, by granting the prosecution's motion in limine, the court did not permit appellant to present to the jury any evidence that Eldridge and Besson had designated him as their primary caregiver. However, defendant did present evidence that he not only supplied Eldridge and Besson and other patients with marijuana, but he counseled them on what types of plants and methods of administration were best for their ailments. In determining that the primary caregiver defense was inapplicable to appellant as a matter of law, we believe the trial court infringed on appellant's constitutional entitlement to present a defense. (Cf. People v. Tilehkooh (2003) 113 Cal.App.4th 1433, 1445, 7 Cal.Rptr.3d 226, [finding a due process violation in trial court's refusal to allow the defendant to rely on the CUA as a defense to a probation violation allegation].)
We agree with the First District Court of Appeal that there "is no prohibition against designating as primary caregiver an individual who also serves in that capacity for others, provided the caregiver ... consistently provides for the housing, health or safety of the designating patient." (Peron, supra, 59 Cal.App.4th at p. 1399, 70 Cal.Rptr.2d 20.) Moreover, we find support in Peron for the notion that appellant, by consistently growing and supplying physician-approved or prescribed medicinal marijuana for a section 11362.5 patient, was meeting an important health need of several medical marijuana patients. (Id. at p. 1400, 70 Cal.Rptr.2d 20.)
Where, as here, appellant presented evidence that he not only grew medical marijuana for several qualified patients, but also counseled them on the best varieties to grow and use for their ailments and accompanied them to medical appointments, albeit on a sporadic basis, there was enough evidence to present to the jury. Decisions about the relative merits of a defense are reserved for the triers of fact. Accordingly, a party who chooses a jury as his or her trier of fact is entitled to *108 their decision. As the trial court conceded in this case, the court left the jury with no choice. The jury had to find appellant guilty on counts one and two. Thus, in effect, the court directed the verdict.[8] Given the state of the evidence, we believe that it was for the jury to decide if appellant was a primary caregiver.
Our Supreme Court has not yet determined what test of prejudice applies to the failure to instruct on an affirmative defense. (People v. Salas, supra, 37 Cal.4th at p. 984, 38 Cal.Rptr.3d 624, 127 P.3d 40.) Respondent argues that appellant suffered no prejudice under either federal or state harmless error review. (Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) We disagree and find prejudice under the more rigorous Chapman test. Under this test, the state must prove the error harmless beyond a reasonable doubt. (People v. Salas, supra, 37 Cal.4th at p. 984, 38 Cal.Rptr.3d 624, 127 P.3d 40.)[9]
Respondent argues that the prosecution presented overwhelming evidence that appellant was cultivating the marijuana strictly for commercial purposes and the jury's finding on the possession for sale count shows that it believed the prosecution's theory of the case, which suggests that any error in failing to instruct the jury on the primary caregiver defense was harmless. At best, respondent's argument begs the question and brings us to appellant's second assignment of error in this case. Specifically, that the court below failed to instruct the jury sua sponte regarding appellant's "right to receive compensation for actual expenses."
At the outset, we point out that the compassionate use defense provided by section 11362.5 is not available to a charge of possession for sale under section 11359. (People v. Galambos (2002) 104 Cal. App.4th 1147, 1165-1167, 128 Cal.Rptr.2d 844; Peron, supra, 59 Cal.App.4th at p. 1389, 70 Cal.Rptr.2d 20.) However, under section 11362.765, subdivision (c), "[a] primary caregiver who receives compensation for actual expenses, including reasonable compensation incurred for services provided to an eligible patient or person with an identification card to enable that person to use marijuana ..., or for payment for out-of-pocket expenses incurred in providing those services, or both, shall not, on the sole basis of that fact be subject to prosecution or punishment under Section 11359 [possession of marijuana for sale]...."
As a threshold matter, we recognize that section 11362.765[10] was enacted in October 2003, several months after appellant's arrest. However, "[t]o the extent that the Medical Marijuana Program [Act] sets forth new affirmative defenses, expands the defense identified by the Compassionate Use Act, and contains no savings *109 clause, that law must be retroactively applied." (People v. Frazier (2005) 128 Cal.App.4th 807, 826, 27 Cal.Rptr.3d 336.) Respondent concedes as much. However, respondent argues that the "reasonable compensation defense" to a charge of possession for sale is available only to a qualified primary caregiver.
We agree with respondent, but point out that this argument brings us back full circle to respondent's reasoning as to why the trial court's error in failing to give a defense requested instruction on an affirmative defense was harmless error. Since the "reasonable compensation defense" is only available to a qualified primary caregiver, and appellant was deprived of the opportunity to rely on this defense, it is no wonder that the jury convicted appellant of possession of marijuana for sale. They had no choice given the evidence that the court allowed counsel to present. Again, it was for the jury to decide if the money that appellant deposited in the bank was "reasonable compensation" for his services of providing medical marijuana, counseling and other support services to qualified patients, or if he was making a substantial profit from sales of marijuana. It is safe to say that the evidence was reasonably susceptible of different interpretations given the testimony of both Yanez and appellant as to the costs of producing the marijuana.
As to the issue of prejudice, again, respondent argues that that there was overwhelming evidence that appellant was "profiting handsomely from his marijuana sales." We point out that this was a disputed matter at trial. As such, the court should have presented the question to the jury with appropriate instructions.
Since we have determined that the trial court prejudicially infringed on appellant's constitutional entitlement to present a defense, we are compelled to reverse the judgment as to counts one and two. As noted, normally, we would not need to address appellant's remaining contentions. However, for the guidance of the trial court in the event of a retrial we address an additional contention.
Appellant argues that the trial court erred when it failed to provide a sua sponte instruction regarding "safe harbor" quantities of marijuana under Santa Cruz County guidelines.
Section 11362.77 enacted as part of the Medical Marijuana Program Act provides that a qualified patient or primary caregiver "may possess no more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature marijuana plants per qualified patient." (§ 11362.77, subd. (a).) Pursuant to section 11362.77, subdivision (c), "Counties and cities may retain or enact medical marijuana guidelines allowing qualified patients or primary caregivers to exceed the state limit set forth in subdivision (a)."
In accordance with section 11362.77, subdivision (c), Santa Cruz County's Medical Marijuana guidelines provide that a qualified patient, or the designated primary caregiver of the patient "may possess amounts of marijuana up to three pounds of dried cannabis bud or conversion per year" and "may cultivate cannabis in an amount not to exceed more than 100 square feet of total garden canopy, as measured by the combined vegetative growth area." (Santa Cruz County Code, tit. 7, ch. 7.124, § 7.124.105, subds. A & B.) Since the Medical Marijuana Program Act specifically permits counties to establish local guidelines for marijuana that exceed permissible state law limits (§ 11362.77, subd. (c)), the Santa Cruz *110 County guidelines are consistent with the legislative mandate.
As respondent concedes, the trial correct was incorrect when it concluded that the "safe harbor" guidelines had no application in this case because they were enacted after the date of appellant's crimes. The new affirmative defenses created under the Medical Marijuana Program Act apply retroactively. (Frazier, supra, 128 Cal.App.4th at p. 826, 27 Cal.Rptr.3d 336.)

Disposition
The judgment is reversed. The matter is remanded for resentencing on count five, unless the prosecutor elects to retry counts one and two.
WE CONCUR: RUSHING, P.J., and PREMO, J.
NOTES
[1] Unless specified, all statutory references are to the Health and Safety Code.
[2] In addition, the jury found appellant not guilty of the manufacture of concentrated cannabis (§ 11379.6, subd. (a), count three) and possession of concentrated cannabis (§ 11357, subd. (a), count four), but guilty of possession of psilocybin mushrooms (§ 11377, subd. (a), count five).
[3] Appellant's other contentions on appeal are as follows: the convictions for cultivation and possession for sale of marijuana must be reversed because the trial court failed to provide a sua sponte instruction regarding safe harbor quantities of marijuana under Santa Cruz County guidelines; the convictions for cultivation and possession for sale must be reversed because the trial court improperly failed to provide sua sponte instructions regarding the defense of lawful medical marijuana association; the conviction for possession for sale must be reversed since the trial court erred by failing to instruct sua sponte on a mistake of law defense; the convictions for cultivation and possession for sale must be reversed because the trial court misstated the burden of proof in instructing the jury with CALJIC No. 12.24.1 and improperly shifted the burden onto appellant; the convictions on all counts and enhancements must be reversed because the trial court erred by admitting irrelevant evidence that a Baretta pistol was found locked in appellant's safe; the convictions for cultivation and possession for sale of marijuana should be reversed because the trial court wrongly excluded evidence relevant to the defense; the trial court erred by instructing the jury that otherwise lawful possession of firearms without any nexus to alleged offenses gives rise to additional criminal liability under Penal Code section 12022; and the cumulative effect of all these errors prejudiced appellant and requires reversal.
[4] On cross-examination, Yanez confirmed that the search failed to locate any ammunition for the rifles.
[5] The prosecution did not dispute that appellant's medical marijuana recommendation was current when Yanez arrested him.
[6] Currently, the issue of whether the Compassionate Use Act (Health & Saf.Code, 11362.5) affords a defense to a charge of transporting, as well as possessing, marijuana is pending before the Supreme Court in People v. Wright, review granted 12/01/2004, S128442.
[7] It appears that patients who obtained their marijuana from FloraCare had to fill out a consent form designating FloraCare as their "`primary caregiver of health care services for the provision of medical cannabis as per the Compassionate Use Act of 1996.'" (Urziceanu, supra, 132 Cal.App.4th at p. 760, 33 Cal.Rptr.3d 859.)
[8] The court told the jury upon discharge, "basically, as a result of my rulings, you were left, quite frankly, with not much choice but to find the defendant guilty of Counts 1 and 2 because of my construction of the law, and that was the manner in which you were instructed."
[9] Appellant argues that the federal Constitution's due process clause requires per se reversal. We need not address this issue as we have decided this case under California law.
[10] Section 11362.765 was added as part of the Medical Marijuana Program Act, a statewide, voluntary, identification card program that became effective on January 1, 2004. In establishing the program, the Legislature's intent was to clarify the scope of the CUA, facilitate the prompt identification of qualified patients and their caregivers, promote uniform and consistent application of the Act, and enhance access to medical marijuana through collective, cooperative cultivation projects. (Stats.2003, ch. 875, § 1(b).)